# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

WEX INC.,

           Plaintiff,

    v.

HP INC. and HEWLETT-PACKARD
DEVELOPMENT COMPANY, L.P.,

           Defendants.

Case No. 2:24-CV-00121-JAW

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND...................................................................................................2

I.     PLAINTIFF WEX INC..................................................................................................2

II.    THE NEW MARKET FOR WORKPLACE EXPERIENCE (OR "WEX") APPS ............3

III.   HP AND ITS HP WEX OFFERING .................................................................................3

ARGUMENT ...........................................................................................................................4

IV.   PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD
      OF SUCCESS ON THE MERITS....................................................................................5

     A.    There Is No Likelihood Of Confusion. ...................................................................5

           1.    The parties' marks are distinct................................................................6

           2.    The parties' products are as similar as
                "jet planes and roller blades." .............................................................8

           3.    The parties' advertising, channels of trade, and
                prospective sophisticated customers are dissimilar. ..................................10

           4.    There is no evidence of actual confusion.....................................................13

           5.    HP adopted its mark in good faith to relate to its services.........................15

           6.    Plaintiff's claimed mark is weak................................................................16

V.     PLAINTIFF CANNOT SHOW IRREPARABLE HARM................................................18

VI.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR HP .................19

CONCLUSION........................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alta Vista Corp. v. Digital Equip. Corp.*,
44 F. Supp. 2d 72 (D. Mass. 1998) ................................................................... 8

*Am. Optical Corp. v. Am. Olean Tile Co.*,
No. 73 Civ. 3900, 1974 WL 20261 (S.D.N.Y. Nov. 27, 1974) ........................... 17

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*,
718 F.2d 1201 (1st Cir. 1983) ............................................................... 11, 12, 14

*Attrezzi, LLC v. Maytag Corp.*,
436 F.3d 32 (1st Cir. 2006) ............................................................................... 7

*Bos. Duck Tours, LP v. Super Duck Tours, LLC*,
531 F.3d 1 (1st Cir. 2008) ................................................................. 5, 6, 16, 17

*C-B Kenworth, Inc. v. Gen. Motors Corp.*,
675 F. Supp. 686 (D. Me. 1987) ....................................................................... 19

*Crosspoint Church v. Makin*,
No. 1:23-cv-00146-JAW, 2024 WL 810033 (D. Me. Feb. 27, 2024) .................... 4

*Cue, Inc. v. Gen. Motors LLC*,
No. 1:13-cv-12647-IT, 2016 WL 4074134 (D. Mass. July 29, 2016) .............. 7, 16

*Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*,
No. 14-cv-02770-WHO, 2014 WL 5361548 (N.D. Cal. Oct. 20, 2014) .............. 12

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ................................................................. 18

*Health New England, Inc. v. Trinity Health – New England, Inc.*,
No. 15-30206-MGM, 2016 WL 4925780 (D. Mass. Sept. 14, 2016) .................. 17

*Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v.
Winship Green Nursing Ctr.*, 103 F.3d 196 (1st Cir. 1996) ....................... 5, 10, 14

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
645 F. Supp. 3d 185 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. 2024) ................ 15

*Joules Limited v. Macy's Merchandising Grp., Inc.*,
No. 15-CV-3645-KMW, 2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016),
*aff'd*, 695 F. App'x 633 (2d Cir. 2017) ............................................................. 14

i

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Keds Corp. v. Renee Int'l Trading Corp.*,
  888 F.2d 215 (1st Cir. 1989) ....................................................................... 7

*L.L. Bean, Inc. v. Bank of Am.*,
  630 F. Supp. 2d 83 (D. Me. 2009) ............................................................... 5

*Maine Forest Prods. Council v. Cormier*,
  586 F. Supp. 3d 22 (D. Me. 2022), *aff'd*, 41 F.4th 1 (1st Cir. 2022) ................... 18

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
  44 F.4th 180 (3d Cir. 2022) ....................................................................... 18

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*,
  832 F.3d 15 (1st Cir. 2016) ......................................................................... 7

*Pan Am. World Airways, Inc. v. Flight 001, Inc.*,
  No. 06 Civ. 14442(CSH), 2007 WL 2040588 (S.D.N.Y. July 13, 2007) ............ 20

*Peoples Fed. Sav. Bank v. People's United Bank*,
  672 F.3d 1 (1st Cir. 2012) ........................................................................... 4

*Peoples Fed. Sav. Bank v. People's United Bank*,
  750 F. Supp. 2d 217 (D. Mass. 2010), *aff'd*, 672 F.3d 1 (1st Cir. 2012) .............. 5, 10, 19, 20

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
  657 F.2d 482 (1st Cir. 1981) ................................................................*passim*

*Programmed Tax Sys., Inc. v. Raytheon Co.*,
  419 F. Supp. 1251 (S.D.N.Y. 1976) ........................................................... 16

*Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*,
  169 F. Supp. 3d 278 (D. Mass. 2016) ......................................................... 11

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ......................................................... 14

*Trak Inc. v. Benner Ski KG*,
  475 F. Supp. 1076 (D. Mass. 1979) .............................................................. 7

*TriMark USA, Inc. v. Performance Food Grp. Co.*,
  667 F. Supp. 2d 155 (D. Mass. 2009) ........................................................... 7

*Two Hands IP LLC v. Two Hands Am., Inc.*,
  563 F. Supp. 3d 290 (S.D.N.Y. 2021) ......................................................... 19

ii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc.*,
    828 F. Supp. 2d 384 (D. Mass. 2010) ................................................................. 16

*Visible Sys. Corp. v. Unisys Corp.*,
    551 F.3d 65 (1st Cir. 2008) ......................................................................... 7, 16

*Vital Pharms., Inc. v. PhD Mktg., Inc.*,
    No. 2:20-cv-06745-RSWL-JCx, 2020 WL 6545995 (C.D. Cal. Nov. 6, 2020) .................. 19

*Walters v. OpenAI, L.L.C.*,
    Case No. 23-A-04860-2 (Ga. Super. Ct., Gwinnet Cnty.) .................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 4

**STATUTES AND RULES**

Federal Rule of Civil Procedure 65 ............................................................... 4

Federal Rule of Civil Procedure 65(c) .......................................................... 20

Lanham Act ........................................................................................ 18

## **INTRODUCTION**

The Court's analysis of Plaintiff's motion must consider the admitted sophistication of the relevant consumers.   Although Plaintiff's papers allude to the fact, HP demonstrates it—the sophisticated consumers of Plaintiff's financial services are not likely to be confused by HP's sale of software targeted to Chief Information Officers ("CIOs") of multi-national enterprises who manage thousands to hundreds of thousands of computers, tablets, printers, and similar devices.

Plaintiff cannot meet its high burden to show a likelihood of success on the merits.   There is no likelihood of confusion here.   Plaintiff is a financial services company whose primary customers are in the trucking industry.   HP manufactures and sells personal computer hardware and related software.   Plaintiff solves payment issues.   HP WEX solves cybersecurity and computer hardware performance issues.   It is undisputed that both parties' customers are sophisticated and purchase the parties' high-cost goods and services after long, careful consideration.   Plaintiff markets and sells to C-suite business executives and human resource managers.   HP markets and sells HP WEX to CIOs—executives at large enterprises who are responsible for managing thousands of connected computers.   The total effect of the parties' use of "WEX" is distinct:   Plaintiff focuses on lower case letters, red text, and stylization to the letter "X"; HP focuses on upper case lettering, black font, and stylization to the letter "W".   HP acted in good faith in selecting an acronym related to its services that are wholly unrelated to Plaintiff.   And finally, Plaintiff has allowed others to use and register a WEX trademark for software without any issues, like the WEX software offering at tradewex.com, making Plaintiff's assertions of irreparable harm unlikely.

Even Plaintiff's survey confirms there is no likelihood of confusion.   Putting aside the survey's design defects, *barely* 20% of individuals matched Plaintiff's WEX and HP's HP WEX even when showing the parties' websites side-by-side (and contrary to market conditions).   This

underscores that the vast number of individuals are not confused by HP's use of WEX.  The Court should deny Plaintiff's motion.

## FACTUAL BACKGROUND

### I.    PLAINTIFF WEX INC.

Plaintiff is a provider of payment processing services to the trucking industry.  Declaration of Eric Ball ("Ball Decl.") ¶ 8, Ex. F.  These payment processing services are its primary source of revenue.  *Id.*  To highlight its trucking connections, Plaintiff was formerly known as Wright Express Corporation but changed its name to an abbreviation:  WEX.  *Id.* ¶ 4, Ex. C.  Similarly, Federal agencies, using the North American Industry Classification Code (NAICS), classify Plaintiff as providing financial transactions processing, reserve, and financial clearinghouse activities.[1]  *Id.*  And Plaintiff describes itself as a "[c]ommercial banking company" that simplifies "business fuel cards, employee benefits, & payment solutions."  *Id.* ¶¶ 6-7, Ex. E.  Thus, Plaintiff has three different business segments that offer its financial services and related technology:



*Id.* ¶ 8, Ex. F.  Plaintiff's marketing further highlights its payments solutions:



*Id.* ¶ 9; *see also id.* ¶ 20, Ex. Q.  Indeed, Plaintiff's self-described competitors are financial

---

[1] By contrast, HP's "NAICS" codes are (1) computer and peripheral equipment manufacturing and (2) electronic computer manufacturing.  Ball Decl. ¶ 5, Ex. D.

institutions and benefits providers.  *Id.* ¶ 8, Ex. F.

## II.   THE NEW MARKET FOR WORKPLACE EXPERIENCE (OR "WEX") APPS

As a result of the COVID-19 pandemic and work-from-home mandates in 2020, by January 2023, Gartner (a technological research firm) reported that 80% of organizations adopted hybrid work, which transformed the workplace experience.  Declaration of Dan Salzman ("Salzman Decl.") ¶ 12, Ex. K.  In response, providers released "workplace experience (WEX) applications" and digital experience ("DEX") applications.  *Id.* ¶ 12, Ex. L.  These new software solutions were designed to support an enterprise's hybrid workplace strategy, while delivering employee satisfaction.  *Id.*  Gartner's 2023 reports listed "potential vendors" of WEX and DEX applications; Plaintiff was not listed.  *Id.*  Since then, there have been more entrants to these markets.  For example, IBM created a workforce experience application it calls WEx.  *Id.* ¶ 4, Ex. E

## III.   HP AND ITS HP WEX OFFERING

HP is a global provider of personal computing and other digital access devices, imaging and printing products, and related technologies, solutions, and services.  Salzman Decl. ¶ 2.

Since the 1990s, HP has offered software services that enable technology managers to receive insights about their devices and has built on that technology ever since.  *Id.* ¶ 3.  Its Workforce Solutions group is presently responsible for developing, marketing, and selling these technologies.  *Id.*  In 2023, HP took the next logical step and developed its branded software to further compete in the WEX and DEX markets Gartner identified earlier that year.  *Id.* ¶¶ 4, 12.

Then, in March 2024, HP announced this new software experience and cybersecurity product for its enterprise clients[2] – the HP Workforce Experience Platform (or "HP WEX").  *Id.* ¶ 5, Ex. F.  HP WEX is marketed to CIOs, and executive-level decisionmakers with similar

---

[2] The target HP WEX customer will manage anywhere from several thousand to hundreds of thousands of devices.  Salzman Decl. ¶ 5.

responsibilities, as a software tool to strengthen cybersecurity for the multitude of endpoint connected devices (*e.g.*, printers, laptops, etc.) that employees use, including by streamlining hardware monitoring and delivering recommendations via HP's AI tool for technology upgrades. *Id.* ¶ 5. HP launched HP WEX because since the pandemic, hybrid work remained commonplace, which presented new technology and security challenges to HP's customers. The employee workforce and their devices are now distributed outside the traditional office, but that workforce still expects their devices to operate seamlessly and securely wherever they are. *Id.* ¶ 12.

HP publicly solicited interested companies to test HP WEX. Based on the response it received and HP's own outreach to targeted HP clients, HP signed up dozens of enterprise companies who will participate in the *private beta* launch of HP WEX in June 2024. *Id.* ¶ 10. None of these companies are headquartered in Maine. *Id.* And none of these companies expressed any confusion about the source or affiliation of HP WEX or Plaintiff's offerings. *Id.*

HP does not use the WEX mark to sell the business solutions that Plaintiff sells. *Id.* ¶ 15. HP also is not a bank or payments company. *Id.*

## ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right" and may only be entered "upon a clear showing that the plaintiff is entitled to such relief." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (citation omitted); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22-24 (2008) (citation omitted). "A judge should use the authority to grant such injunctive relief 'sparingly.'" *Crosspoint Church v. Makin*, No. 1:23-cv-00146-JAW, 2024 WL 810033, at *8 (D. Me. Feb. 27, 2024) (citation omitted).

"To obtain preliminary injunctive relief under Fed. R. Civ. P. 65, a movant must demonstrate (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships and (4) a fit (or lack of

4

friction) between the injunction and the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 750 F. Supp. 2d 217, 221 (D. Mass. 2010), *aff'd*, 672 F.3d 1 (1st Cir. 2012). "The sine qua non of the four part test is likelihood of success on the merits: if the moving party cannot demonstrate that it is likely to succeed in its quest, the remaining factors become matters of idle curiosity." *L.L. Bean, Inc. v. Bank of Am.*, 630 F. Supp. 2d 83, 86-87 (D. Me. 2009). Plaintiff, as the moving party, "bears the burden of establishing that these four factors weigh in its favor" and "[t]his burden is a heavy one." *Id.* at 86. Plaintiff cannot meet the heavy burden for drastic relief.

## IV.   PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

"To succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark protection,[3] and (2) that the allegedly infringing use is likely to cause consumer confusion." *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008). Plaintiff "must show more than the theoretical possibility of confusion." *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996). Indeed, "the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Bos. Duck Tours*, 531 F.3d at 12 (quoting *Int'l Ass'n of Machinists*, 103 F.3d at 201).

### A.   There Is No Likelihood Of Confusion.

Courts in this circuit consider the eight *Pignons* factors in assessing the likelihood of confusion. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981). Here, each of the *Pignons* factors weighs decisively against any likelihood of confusion.

---

[3] For purposes of this motion only, HP does not challenge the validity of Plaintiff's marks. It reserves its right to do so. Nevertheless, as explained below, even valid marks can be weak and entitled to narrow protection.

### 1.     The parties' marks are distinct.

"The degree of similarity between two marks . . . is determined by analyzing their sight, sound, and meaning." *Bos. Duck Tours*, 531 F.3d at 24.  "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons*, 657 F.2d at 487.  Here, the total effect in the marketplace differs significantly:

| Plaintiff's Mark | HP's Mark |
|---|---|
|  |  |

Plaintiff's mark is red.  HP's is not.  Plaintiff's mark uses standard font with a lowercase "e."  HP's mark does not.  HP's mark features custom lettering and uses stylized, block, all capital letters.  Plaintiff does not.  Plaintiff's mark uses a different font and a rounded "w" that looks like a lowercase letter.  HP uses a distinctive hexagon and two lines to depict the capital "W" in its mark.  Plaintiff does not modify the form of the "w."  Instead, Plaintiff's mark has an arrow on the left side of its "X", which evokes a sense of movement in relation to its trucking customers.  HP does not modify the form of the "X."  Most importantly, HP uses its house mark "HP" with the WEX mark.  Contrary to Plaintiff's assertions, use of a house mark dispels any appreciable confusion.  *See Pignons*, 657 F.2d at 487 (finding no likelihood of confusion, including reverse confusion, where the First Circuit "and other courts have indicated that in certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.") (collecting cases).

Although Plaintiff argues that HP's use of its house mark with WEX increases the likelihood of reverse confusion, there can be "no actionable reverse confusion in the absence of a showing of likely confusion as to source or sponsorship" in the first place, which is absent here.

*Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 72 (1st Cir. 2008).  To illustrate, Plaintiff's cited cases are distinguishable because they involved parties that were in direct competition or offered overlapping goods or services.  *See Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 832 F.3d 15 (1st Cir. 2016) (finding confusion between a bank and credit union using COOP ORIENTAL and COOPERATIVE ORIENTAL); *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006) (finding confusion where parties' goods—small electric kitchen appliances—overlapped); *TriMark USA, Inc. v. Performance Food Grp. Co.*, 667 F. Supp. 2d 155, 164 (D. Mass. 2009) (granting preliminary injunction where parties offered "directly competing products in the same markets with virtually identical logos."); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir. 1989) (affirming a finding of confusion where parties were direct competitors, defendant had an intent to capitalize on plaintiff's success, and "there is 'no doubt' that [defendant's] mark 'is nearly identical to [plaintiff's]'"); *Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076 (D. Mass. 1979) (granting preliminary injunction where the parties' goods directly competed and purchasers were unsophisticated).  None of these facts exists here.  This is not a situation where HP's use of its house mark would aggravate confusion because there is no likelihood of confusion given the distinct marks, goods and services, and sophisticated purchasers.

Even more, the parties' marks have distinct meanings that relate to their goods and services. HP's mark is an acronym for its "Workforce Experience Platform" solution.  Salzman Decl. ¶¶ 5, 12.  Plaintiff's mark is an acronym for "Wright Express," and describes its fuel cards that allow fleets of trucks to efficiently pay for fuel to get to their destinations faster.  *See* Dearborn Decl. ¶¶ 6-8.  Because the meanings of the parties' marks are "highly dissimilar," this factor favors HP. *See Cue, Inc. v. Gen. Motors LLC*, No. 1:13-cv-12647-IT, 2016 WL 4074134, at *5 (D. Mass. July 29, 2016) (finding similarity-of-marks factor favored defendant where it used its house mark, and

the meanings were "highly dissimilar.").

> ### 2.    The parties' products are as similar as "jet planes and roller blades."

In *Pignons*, the court noted that although both products were "single lens reflex cameras," "they have little in common," and therefore this factor favored an absence of likelihood of confusion.  657 F.2d at 487.  Extending *Pignons* by analogy to this case – the products at issue are only similar insofar as they relate to software, generally.  But that is where the similarity ends. *What* each software product does and *why* it is useful to its respective consumers differ so much as to render the better analogy to be one of jet planes to roller blades, which are similar insofar as they both provide transportation.  *Alta Vista Corp. v. Digital Equip. Corp.*, 44 F. Supp. 2d 72, 77 (D. Mass. 1998) (denying plaintiff's motion for preliminary injunction and finding that defendant's mark was not likely to confuse the public; "Jet planes and roller blades could be characterized as transportation products.  Such semantic exercises are simply not helpful in assessing likelihood of confusion.").  In today's digital economy, that a product is "software" or even "software as a service" is not an effective differentiator; HP does not compete with every business that sells software as a service.  Salzman Decl. ¶ 15.  This is likely why the USPTO did not refuse HP's trademark application after reviewing Plaintiff's registrations.  *See* Ball Decl. ¶ 2, Ex. A; Salzman Decl. ¶ 13, Ex. M.  There is no similarity between the parties' offerings.  Even still, the thrust of HP's sales of HP WEX will not be as a separate software service, but rather as software pre-installed on HP computers sold directly to enterprise customers.  Salzman Decl. ¶ 5.

Further, Plaintiff's evidence does not permit an inference that the parties' products are so similar that relevant consumers could be confused.  Plaintiff markets itself as a "commercial banking company."  Ball Decl. ¶ 6, Ex. E.  Unsurprisingly then, it advertises products that "simplify" "payment solutions."  *See* Dearborn Decl. Ex. B at 1.  It does not manufacture, market, or sell computers.  *See id.*  Nor does it manufacture, market, or sell computer software to improve

the functionality of computers. *See id.* HP is unequivocally ***not*** a bank—it manufactures, markets, and sells computer hardware and related software to improve the functionality of computer hardware. Salzman Decl. ¶ 15. To that end, HP created HP WEX—one of HP's newest software offerings developed in the wake of the COVID-19 pandemic to solve for a dispersed, mobile workforce and related computer device-management challenges. *Id.* ¶ 12.

More specifically, HP WEX is a software product designed to allow CIOs to manage endpoint computer devices. *Id.* ¶¶ 5-7, Exs. F, G. For example, HP WEX uses AI learning about employee usage of endpoint devices to help information technology managers determine when to upgrade the devices or software they manage. *Id.* ¶ 7, Ex. G. HP WEX can also help CIOs determine when a computer battery is about to fail or needs upgrading, when a laser printer has a failure and needs replacement, or whether the print quality of a laser printer is compromised. *Id.* HP WEX is also designed to increase the cybersecurity for a business's multiple endpoint devices. *Id.* HP plans to add features that will help CIOs determine when an anomaly exists on a device and the root cause of that anomaly, as well as help employees troubleshoot their own device support issues. *Id.* HP has no plans to add payment support features to HP WEX. *Id.*

Plaintiff's software does not offer any of HP WEX's functionality for endpoint device management and cybersecurity. Rather, Plaintiff's solutions target making payments easier for its business clients: "fuel cards for small business and large fleets"[4]; "easy-to-manage employee benefits"; and simplification of "business payments to everyone." Dearborn Decl. Ex. B at 1.

---

[4] Plaintiff's focus on the parties' use of the word "fleet" is misplaced because they refer to two different things. Plaintiff—writing to its consumers—uses "fleet" to refer to vehicles. Dkt. 9-3 at 5. HP—writing to its consumers—uses "fleet" to refer to technology devices. Salzman Decl. ¶ 8. For HP, "fleet" is widely understood in its industry to refer to devices and would not be confused with a fleet of two-ton trucks. *Id.* By analogy, a purchaser of a computer "mouse" would understand that the product they are buying is not a "mouse" from a pet store. Plaintiff offers no evidence that the executives it interacts with would be confused because of the word "fleet."

Plaintiff advertises that its software can help businesses "[s]ave money on fuel and charging for any number of vehicles."  *Id.* at 5.  Similarly, its payments solution "makes it easy to pay and get paid across" the entire business.  *Id.* at 6.  By extension, its benefits solutions allow "employees and members [to] get the most value from their company benefits."  *Id.*  Some of the many things that Plaintiff does not do is help information technology administrators manage the business's endpoint devices, such as identifying when to upgrade hardware or software or provide enhanced cybersecurity.  *Id.* at 2-61; *compare with* Salzman Decl. ¶¶ 3-8.  While Plaintiff's motion argues that it and HP WEX use AI, Plaintiff appears to use AI for a chatbot "designed to enhance the personalized benefits account experience delivered by its Health division," which is not how HP uses AI (*i.e.*, to predict the necessity of hardware or software failure or the need to upgrade). *Compare* Ball Decl. ¶ 11, Ex. H *with* Salzman Decl. ¶ 7.  Finally, government agencies and industry researchers do not classify Plaintiff and HP as existing in the same market or being competitors.  Ball Decl. ¶¶ 3-5, Exs. B-D; Salzman Decl. Exs. K-L.  This factor decisively weighs against Plaintiff.

### 3. The parties' advertising, channels of trade, and prospective sophisticated customers are dissimilar.

"Similarities of advertising, channels of trade and prospective customers are generally considered together."  *Peoples Fed. Sav. Bank*, 750 F. Supp. 2d at 225.  In assessing the parties' customers, courts "must [also] ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark."  *Int'l Ass'n of Machinists*, 103 F.3d at 204.

Here, the purchasers of the parties' products are not the same.  HP's target purchasers are CIOs.  Salzman Decl. ¶ 5.  Even more, at least 80% of HP WEX users are expected to be existing HP customers (*i.e.*, they already use HP hardware) who know and trust HP's high standards and are loyal to the brand.  *Id.* ¶ 11.  Indeed, HP WEX will primarily be sold as a bundle with HP

hardware. *Id.* Plaintiff, on the other hand, claims to target C-Suite executives, procurement professionals, and HR personnel given Plaintiff's financial services for vehicle fleets, employee benefits, and corporate payments. *See* Mot. at 3, 4, 14. Although Plaintiff also claims it "works with" CTOs and IT departments and executives, that involvement appears to be in the context of *integrating* Plaintiff's software after purchase. *See id.* at 14 ("implement[ing] either WEX-branded platform often requires the involvement of IT representatives, [and] the chief technology officer").[5] Plaintiff also has no evidence of overlapping purchasers. At most, Plaintiff points to a broad category of business executives. But that is effectively meaningless given that companies are "composed of separate departments with diverse purchasing requirements." *See Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983) (finding likelihood of confusion "simply inconceivable" despite both parties providing products to hospitals because a "'hospital community' is not a homogenous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products."). And, although Bekaert (an HP WEX collaborator) is not a current HP WEX customer (Mot. at 6), even if it were to purchase HP WEX, its European employees would make that purchase. Salzman Decl. ¶ 17. Thus, HP's relationship to Bekaert is not relevant to this U.S. trademark dispute for numerous reasons.

The parties also do not compete with each other. *Id.* ¶¶ 3, 15-16, Ex. D. Plaintiff told the SEC that it competes with "financial institutions" and providers of "benefit solutions." Ball Decl. ¶ 8, Ex. F. HP is neither of these things. HP's competitors include companies providing device

---

[5] These types of commercial buyers are informed, sophisticated purchasers who are not likely to be confused. *See Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 294 (D. Mass. 2016) ("The likelihood of confusion may be substantially reduced when the relevant buyer class is composed of sophisticated professional or commercial purchasers of goods and services.").

management tools such as Dell, Microsoft, and Xerox.  *See* Salzman Decl. ¶ 3, Ex. D.  Indeed, NAICS places the parties in different classifications.  *See* Ball Decl. ¶¶ 3-5, Exs. B-D.

Even if the parties were to have overlapping customers (they do not), Plaintiff concedes that the parties' prospective customers are sophisticated, making confusion unlikely.  *See* Dkt. 1 (Compl.) ¶ 23 (noting the sophistication of Plaintiff's customers "given the level of technology integration required in many of WEX's product offerings"); *see also*, Salzman Decl. ¶¶ 5, 11. *Astra Pharmaceutical* is instructive here.  718 F.2d at 1207.  There, the First Circuit held confusion was "simply inconceivable" despite the parties' use of an identical ASTRA mark for medical products because defendant's product cost "thousands of dollars" and took "three months to a year to consummate the sale" with sophisticated, careful buyers.  *Id.* at 1206-07.  Likewise, here, HP WEX customers may take six months or more evaluating the software before purchasing it and will be expected to spend between six and eight figures (*e.g.*, $999,999 - $10,000,000+) to acquire it.  Salzman Decl. ¶ 11.  Given the parties' sophisticated purchasers, expensive products[6], and long sales process, customers will purchase after careful consideration, dispelling any likelihood of confusion.  *Astra Pharm.*, 718 F.2d at 1206-07 (holding sophistication of customers the "most critical factor" in finding "no realistic likelihood of confusion").

In response, Plaintiff argues that the parties' advertising and trade channels are the same because they both advertise through websites and social media.  But that kind of advertising is not useful for assessing likelihood of confusion.  *See, e.g.*, *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-cv-02770-WHO, 2014 WL 5361548, at *12 (N.D. Cal. Oct. 20, 2014) ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use

---

[6] Plaintiff did not offer any evidence about the cost of its products.  Based on what little evidence Plaintiff did submit, it is reasonable to infer that Plaintiff's financial services cost more than a camera.  *Pignons*, 657 F.2d at 488-89.

of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.") (citation omitted)).

Plaintiff also claims that the parties advertise at the same conferences and trade shows but fails to identify a single conference or trade show at which both parties sold their products.  HP is not aware of Plaintiff attending any of the same conferences as HP, let alone having employees speak on the same panel or hosting a trade show booth on the same expo floor.  Salzman Decl. ¶ 16.  Finally, Plaintiff argues that the parties' "advertising message" is the same because their products "reduce 'digital friction'" and "increas[e] productivity, unlocking the 'full potential' of its customers."  Mot. at 14.  But this non-specific marketing puffery can be said about virtually *every* company.  In context, the parties' marketing shows that Plaintiff's solutions and HP WEX solve *different* business problems in *different* industries.  This factor weighs against Plaintiff.

### 4.    There is no evidence of actual confusion.

Plaintiff offers no evidence of actual confusion.  Nor can it.  HP has been promoting HP WEX for more than two months to thousands of potential customers and has already garnered extensive engagement, yet not a single consumer has been confused.  Salzman Decl. ¶¶ 14, 19. What is more, when HP filed its trademark application with the USPTO to register the "WEX" mark, "[t]he trademark examining attorney [] searched the USPTO database of registered and pending marks and [] found no conflicting marks that would bar registration under Trademark Act Section 2(d)."  Ball Decl. ¶ 2, Ex. A; Salzman Decl. ¶ 13, Ex. M.

Plaintiff points to a single online article as a would-be example of confusion.  *See* Dearborn Decl. Ex. H.  But the article Plaintiff relies on was created using generative artificial intelligence[7]

---

[7] One of the known flaws of modern AI systems is their ability to "hallucinate" facts.  *See Walters v. OpenAI, L.L.C.*, Case No. 23-A-04860-2 (Ga. Super. Ct., Gwinnet Cnty.) (complaint alleging that popular generative AI ChatGPT made up, or "hallucinated," facts to the effect that plaintiff was involved in a lawsuit that he was not, in fact, involved in).

(*see* Ball Decl. ¶ 19, Ex. P); in other words, no ***person***—consumer, journalist, or "sophisticated part[y]"—was confused. *See Astra Pharma.*, 718 F.2d at 1206-07 ("If likelihood of confusion exists, it must be based on the confusion of some relevant ***person***; *i.e.*, a customer or purchaser"; "any confusion has to exist in the mind of a relevant ***person***.") (emphasis added). But even if this were an isolated example of purported confusion, it is not sufficient to show that an ***appreciable number*** of consumers were confused. *See Int'l Ass'n of Machinists*, 103 F.3d at 200-201 ("Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion."). Indeed, the First Circuit has highlighted that a single instance of misdirection such as this "is very weak evidence of consumer confusion." *Pignons*, 657 F.2d at 490.

Additionally, Plaintiff's survey is fundamentally flawed, and thus, does not demonstrate any actual confusion. *See* Declaration of Laura O'Laughlin ("O'Laughlin Decl.") ¶¶ 14-15. ***First***, Squirt was the incorrect survey format to use. *See id.* ¶ 18. "The line-up format is most appropriate in situations where two marks will appear in close proximity in the marketplace, i.e., in the same store or even on the same shelf." *Joules Limited v. Macy's Merchandising Grp., Inc.*, No. 15-CV-3645-KMW, 2016 WL 4094913, at *9 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir. 2017). Here, the products are not sold in the same stores or websites.

***Second***, Sarah Butler's methodology does not reflect the circumstances in which consumers encounter Plaintiff's and HP's marks in the marketplace—it is little more than a "matching game." *See* O'Laughlin Decl. ¶ 20; *see also THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 232 (S.D.N.Y. 2010). Indeed, the "two-room" design of the survey forces respondents to consider the marks in close proximity—contrary to real marketplace conditions. *See* O'Laughlin Decl. ¶¶ 21-25. Likewise, Ms. Butler's use of static screenshots as opposed to interactive websites was improper because it did not allow respondents to interact with the websites as they ordinarily

would in the marketplace.  Regardless, no HP customer will purchase HP WEX based solely on a website.  *See* Salzman Decl. ¶ 11.  Plaintiff offered no evidence that its customers would either.

**Third**, Plaintiff's survey skews the results with leading questions that encouraged respondents to hunt for associations.  O'Laughlin Decl. ¶¶ 26-30; *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 265 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. 2024).

**Fourth**, Ms. Butler failed to test the relevant population.  *See* O'Laughlin Decl. ¶ 31. Ms. Butler's survey sample is predicated on the incorrect assumption that the same individuals would be potential customers of both parties and used vague screener questions.  *See id.* ¶¶ 33-35. These errors render the results fatally flawed.  *See id.* ¶ 40.

**Finally**, Ms. Butler failed to control for respondent certainty in their "confusion," effectively counting respondents as "confused" when they were guessing.  *See id.* ¶¶ 41-44. Academic research suggests that when surveys consider respondent certainty, confusion estimates are reduced by roughly 14% to 50%.  *See id.* ¶ 45.  Applying an assumed confidence reduction (given that Ms. Butler declined to test for respondent confidence) leads to a range of no more than 17.9-10.4% of respondents who could be considered confused based on Ms. Butler's survey.

The results of Ms. Butler's survey confirm that there is no likelihood of confusion because even after showing HP's HP WEX website and Plaintiff's website in sequence, contrary to market conditions, encouraging respondents to re-review and match the HP WEX website, asking leading questions, surveying an inappropriate and poorly defined sample, and failing to control for respondent confidence, at **most** 20.8% of individuals matched Plaintiff's WEX and HP's HP WEX.

### 5.    HP adopted its mark in good faith to relate to its services.

Plaintiff presents no evidence that HP intentionally used the WEX mark to ride on Plaintiff's goodwill.  HP selected the name WEX in good faith.  *See* Salzman Decl. ¶¶ 12-16. Plaintiff suggests that the mere fact that it owns registrations for the WEX mark supports a finding

of bad faith.  But the First Circuit has clarified that "[b]ad faith differs from 'willfulness,' which arises when an infringer proceeds despite knowledge of the senior user's trademark." *See Visible Sys.*, 551 F.3d at 75.  "While willfulness may be relevant to damages after a finding of infringement, only bad faith is relevant to a likelihood of confusion." *Cue*, 2016 WL 4074134, at *8.  "Bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks." *Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 395 (D. Mass. 2010).  "[M]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *Cue*, 2016 WL 4074134, at *9 (cleaned up).

Here, Plaintiff fails to offer any evidence that HP adopted the WEX mark with the intent to confuse or capitalize on Plaintiff's purported goodwill.  And it cannot because HP did not have this intent.  When HP's Workforce Solutions team selected the WEX mark, it had never heard of Plaintiff or its claimed goods and services.  Salzman Decl. ¶¶ 13, 16.  This is unsurprising given that Plaintiff did not own either the wex.com domain or the @Wex "X" (formerly Twitter) username.  Even more, the Trademark Office's finding that there was no confusion reinforces HP's good faith belief that there would be no likelihood of confusion here.  Ball Decl. ¶ 2, Ex. A; Salzman Decl. ¶ 13, Ex. M.  This factor favors HP.  *See Bos. Duck Tours*, 531 F.3d at 30 (lack of bad faith weighed against a finding of infringement).

### 6.   Plaintiff's claimed mark is weak.

Conceptually, each party admittedly uses WEX to relate to its underlying, and disparate, offerings.  Plaintiff previously operated as Wright Express Corporation but abbreviated its name to WEX.  Ball Decl. ¶ 4, Ex. C.  HP uses WEX as an acronym for Workforce Experience Platform.  Salzman Decl. ¶ 12.  Courts have found trademarks that are acronyms to be generally weak marks.  *See*, *e.g.*, *Programmed Tax Sys., Inc. v. Raytheon Co.*, 419 F. Supp. 1251, 1253 (S.D.N.Y. 1976)

(finding "[c]ombinations of letters of the alphabet are readily available for use by anyone and are merely descriptive."); *Am. Optical Corp. v. Am. Olean Tile Co.*, No. 73 Civ. 3900, 1974 WL 20261, at *6 (S.D.N.Y. Nov. 27, 1974) ("The initials AO are letters in the alphabet available for use by everyone.  It is merely descriptive and must be characterized as a weak mark.").

Plaintiff also fails to introduce sufficient evidence that its trademark is anything other than a weak mark.[8]  It introduced no evidence that it has won awards or received independent press for its brand.  *Bos. Duck Tours*, 531 F.3d at 23-24.  And it likely cannot.  Plaintiff has less than 2,000 followers on its "X" social media account, and its posts receive minimal, if any, engagement.  Ball Decl. ¶ 12, Ex. I.  Plaintiff's argument that its mark is strong is also belied by the fact that other companies have registered or use a WEX mark or similar marks, including for financial and software-related goods and services.  *Id.* ¶¶ 13-18, Exs. J-O.  Further, Plaintiff's unsupported statement that it spent $100 million on marketing does not detail how much was spent marketing the WEX trademark as opposed to, for example, employee opportunities or salaries.  Plaintiff has not satisfied its burden of proving the strength of its mark.  *See Health New England*, 2016 WL 4925780, at *3 ("Although HNE has provided estimated advertising figures, these figures represent the company's total advertising and, thus, are not limited to promoting this particular mark . . . On these limited facts, therefore, the court finds HNE's mark is not particularly strong.").

In sum, there is no likelihood of confusion between the parties' respective marks.  Accordingly, the Court need not consider the other preliminary injunction factors because Plaintiff failed to meet its burden of likelihood of success on the merits.  But even it does, Plaintiff failed to carry its burden as to the remaining factors as well.

---

[8] Incontestable marks can still be weak marks.  *See Health New England, Inc. v. Trinity Health – New England, Inc*., No. 15-30206-MGM, 2016 WL 4925780, at *3 (D. Mass. Sept. 14, 2016).

## V.   PLAINTIFF CANNOT SHOW IRREPARABLE HARM

Plaintiff has not demonstrated irreparable harm to warrant the drastic remedy of a preliminary injunction.  While the Lanham Act provides a rebuttable presumption of irreparable harm **if** there is "a finding of likelihood of success on the merits," courts have found the presumption is rebutted when the defendant makes even a "slight evidentiary showing" that plaintiff will not suffer irreparable harm, after which the presumption "disappears like a bursting bubble." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022).  The burden then shifts back to plaintiff to prove irreparable injury is "likely" without an injunction, and not merely a "possibility." *Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 33 (D. Me. 2022), *aff'd*, 41 F.4th 1 (1st Cir. 2022).

The presumption is rebutted where, as here, Plaintiff delays in applying for preliminary injunctive relief because it undercuts the urgency and highlights that there is no irreparable harm. *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (collecting cases).  Plaintiff filed this motion more than four months after HP filed its trademark application.  Ball Decl. ¶ 2, Ex. A.  In Plaintiff's motion to expedite, Plaintiff acknowledges that it was aware of HP's application in December 2023, but claims that it sat idle because it did not know how HP planned to use the mark until March 2024.  Dkt. 13 at 2 n.2.  This is an artificial distinction.  HP's trademark application describes in detail the goods and services it intends to use with the mark. *Id.*  Plaintiff's delay belies any claim of urgency or harm.

Even if Plaintiff had not delayed, it failed to carry its high burden of showing irreparable harm.  The purported evidence Plaintiff provides as showing irreparable harm is an unsupported, self-serving declaration of supposed and cherry-picked consumer comments on social media about HP.  Dearborn Decl. ¶ 56.  But this fails to show irreparable harm because Plaintiff's alleged

reputation is based on financial services primarily in the freight industry, not laptops or printers from HP. *See Vital Pharms., Inc. v. PhD Mktg., Inc.*, No. 2:20-cv-06745-RSWL-JCx, 2020 WL 6545995, at *8 (C.D. Cal. Nov. 6, 2020) (holding that evidence of customer dissatisfaction with defendant did not establish irreparable harm because plaintiff's reputation was premised on energy drinks, not e-cigarettes). Of course, if there is any association between the parties' brands, Plaintiff likely benefited from being associated with a top-tier brand like HP, a well-known pioneer in the technology industry. Salzman Decl. ¶¶ 2, 18.

Further, Plaintiff's conclusory statements of irreparable harm to its goodwill and loss of control of its reputation (Dearborn Decl. ¶¶ 52-58) are speculative and do not meet its high burden. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 301 (S.D.N.Y. 2021) ("plaintiff's fears of bad restaurant reviews as a result of consumer confusion are merely speculative; they cannot support a finding of irreparable injury."). That HP has been using HP WEX for months now, with no evidence of confusion, further indicates that there is no irreparable harm. *See Peoples Fed. Sav. Bank*, 750 F. Supp. 2d at 227 ("[T]he fact that Peoples United has been using its name to operate the former Butler branches for more than three months with scant evidence of consumer confusion . . . suggests that harm is neither imminent nor irreparable.").

## VI.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR HP

There is no doubt that the balance of hardships weighs in HP's favor. HP would incur significant losses if a preliminary injunction issued, including the loss of time and money invested in the development, promotion, and launch of HP WEX, and irreparable damage to its goodwill and reputation from any abrupt halt and rebrand. Salzman Decl. ¶¶ 19-20. This disruptive result is "far more drastic than the effect of denying Plaintiff's motion." *C-B Kenworth, Inc. v. Gen. Motors Corp.*, 675 F. Supp. 686, 688 (D. Me. 1987). Plaintiff's claim that HP "can easily rebrand" is false. Mot. at 19. To change its mark, HP would need to select a new brand and re-educate the

market at considerable expense and impact on consumers.  Salzman Decl. ¶¶ 19-20; *see Pan Am. World Airways, Inc. v. Flight 001, Inc.*, No. 06 Civ. 14442(CSH), 2007 WL 2040588, at *20 (S.D.N.Y. July 13, 2007) (balance of hardships favored defendant where injunction would require rebranding, which would result in loss of goodwill, revenue, and out-of-pocket costs).  In contrast, despite HP's launch more than two months ago, Plaintiff has not experienced any customer confusion, and the hardship it asserts is false speculation about possible harm from being associated with a leading technology brand.

Plaintiff also cannot show that the public interest would be served by the issuance of an injunction.  Where, as here, there is no likelihood of confusion, granting an injunction would do more harm than good.  *Peoples Fed. Sav. Bank*, 750 F. Supp. 2d at 227 (finding public interest did not weigh in plaintiff's favor because it did not adequately demonstrate confusion); Salzman Decl. ¶ 20 (confusion from rebrand).

Accordingly, the balance of hardships and public interest favor HP.

<u>**CONCLUSION**</u>

HP respectfully requests that the Court deny Plaintiff's motion.[9]

---

[9] If the Court grants the Motion, Plaintiff should be required to provide adequate security under Fed. R. Civ. P. 65(c) of no less than $2,500,000 due to the harm HP will suffer.

Dated:   May 14, 2024                          Respectfully submitted,


___*/s/ Stacy O. Stitham*_____              ___*/s/ Eric Ball*_____
Peter J. Brann                                 Eric Ball*
Email: pbrann@brannlaw.com                     Email: eball@fenwick.com
Stacy O. Stitham                               Kimberly Culp*
Email: sstitham@brannlaw.com                   Email: kculp@fenwick.com
BRANN & ISAACSON                               Irene Del Rocio Aguirre*
113 Lisbon Street                              Email: iaguirre@fenwick.com
Lewiston, ME 04240                             Kathryn M. Hauh*
207.689.9731                                   Email: khauh@fenwick.com
                                               FENWICK & WEST LLP
                                               801 California Street
Attorneys for Defendants                       Mountain View, CA  94041
HP INC. and HEWLETT-PACKARD                    650.988.8500
DEVELOPMENT COMPANY, L.P.
                                               *Admitted Pro Hac Vice