UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| WEX INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:24-cv-00121-JAW |
| | ) | |
| HP INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

At issue in this motion for preliminary injunction is whether the defendant's new software, which bears the same name as the plaintiff company, infringes on the plaintiff's trademarks. The plaintiff asks the court to enjoin the defendant from using any allegedly infringing mark for the duration of this litigation. Applying the First Circuit's criteria for assessing likelihood of consumer confusion, the Court determines the plaintiff is likely to succeed on the merits because the marks at issue are nearly identical, the products are similar, the parties use the same marketing terms to promote the products, the plaintiff's marks are strong, and the plaintiff has put forth convincing evidence of actual confusion. The court also concludes the plaintiff would suffer irreparable harm absent an injunction because the defendant's allegedly infringing product is scheduled to launch before this case can proceed to trial, thereby running the risk of saturating the market with potential infringement and depriving the plaintiff of control over its brand and goodwill. As the balance of equities and public interest also favor preliminary injunctive relief, the Court grants the plaintiff's

motion.    Accordingly, the defendant may not use "WEX" for the duration of this litigation.

## I.    PROCEUDRAL BACKGROUND

On April 11, 2024, WEX Inc. (WEX) filed a civil trademark infringement action against HP Inc. and Hewlett-Packard Development Company, L.P. (collectively, HP), arising out of the impending launch of HP's "Workforce Experience Platform," branded as "WEX." *Compl.* (ECF No. 1).    The complaint alleges: 1) registered trademark infringement in violation of section 32 of the Lanham Act, 15 U.S.C. § 1114, *id.* ¶¶ 54-61; 2) common law trademark infringement in violation of Maine law, *id.* ¶¶ 62-68; 3) unfair competition in violation of 15 U.S.C. § 1125, *id.* ¶¶ 69-75; and 4) violations of Maine's Uniform Deceptive Trade Practices Act, 10 M.R.S. § 1212. *Id.* ¶¶ 76-82. WEX also seeks cancellation of HP's pending trademark application for "WEX," pursuant to 15 U.S.C. § 1119. *Id.* ¶¶ 83-89.    On May 14, 2024, HP answered the complaint. *HP Inc.'s and Hewlett-Packard Development Company, L.P.'s Answer to Compl.* (ECF No. 33).

On April 12, 2024, WEX filed a motion for preliminary injunction, seeking to enjoin HP from using "WEX" for the duration of this litigation and "to return the parties to their position prior to HP's adoption of the 'WEX' brand." *WEX Inc.'s Mot. for Prelim. Inj.* at 8 (ECF No. 9) (*Pl.'s Mot.*).    On May 14, 2024, HP responded in opposition. *Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.* (ECF No. 34) (*Defs.' Opp'n*).    On May 28, 2024, WEX replied.  *WEX Inc.'s Mem. of Law in Further Supp. of Its Mot. for*

*a Prelim. Inj.* (ECF No. 38) (*Pl.'s Reply*).  On June 4, 2024, WEX filed an additional attachment in support of its motion.  *Additional Attachs.* (ECF No. 42).

On May 8, 2024, WEX moved for an evidentiary hearing on its motion for preliminary injunction.  *WEX Inc.'s Mot. for Evidentiary Hr'g* (ECF No. 27).  On May 13, 2024, the Court granted in part and deferred in part WEX's motion for evidentiary hearing, scheduling oral argument and notifying the parties that an evidentiary hearing would be scheduled later if the Court determined one was necessary.  *Order* (ECF No. 31).  After reviewing the submitted material, the Court determined that no evidentiary hearing was necessary and held oral argument on July 1, 2024.  *Min. Entry* (ECF No. 45).

Following oral argument, on July 1, 2024, WEX submitted additional correspondence in response to the Court's request for its position on the amount of bond that should be required pursuant to Federal Rule of Civil Procedure 65(c).  *Notice/Correspondence Re: Suppl. Information* (ECF No. 46) (*Pl.'s Suppl. Notice*).  On July 3, 2024, HP filed its response to WEX's supplemental correspondence.  *Notice/Correspondence Re: Suppl. Information* (ECF No. 47) (*Defs.' Suppl. Notice*).

## II.    FACTUAL BACKGROUND[1]

### A.    The Parties

#### 1.    WEX Inc.

WEX originated in 1895 as "A.R. Wright," a family business operating in the coal importing and heating industry.  *Pl.'s Mot.*, Attach. 1, *Decl. of Joel Dearborn in*

---

[1]    The Court has compiled these facts from: 1) WEX's motion for preliminary injunction and attachments; 2) HP's opposition and attachments; and 3) WEX's reply and attachments.

*Supp. of Pl.'s Mot. for a Prelim. Inj.* ¶ 5 (*Dearborn Decl.*).  In 1983, one of the family members founded Wright Express Corporation, a pioneer in the development of payment solutions for businesses operating fleets of vehicles.  *Id.* ¶¶ 5-6.  Although Wright Express initially offered solely fuel cards, during the 1990s and early 2000s, the company launched other goods and services, including employee benefits management, expanded payment solutions, and fleet management.  *Id.* ¶ 8.  In 2005, Wright Express was listed on the New York Stock Exchange, and the company has used the stock ticker "WEX" for more than a decade.  *Id.* ¶ 6.

In 1989, Wright Express began referring to itself as "WEX" in advertisements, on fuel cards, and on company documents.  *Id.* ¶ 7.  The company officially adopted "WEX" as its corporate umbrella brand in 2012.  *Id.* ¶ 8.  The company intended this name change to signal its shifting focus to technology and the diversification of its product lines.  *Pl.'s Reply*, Attach. 1, *Rebuttal Decl. of Joel Dearborn in Further Supp. of Pl.'s Mot. for a Prelim. Inj.* ¶ 5 (*Dearborn Rebuttal Decl.*).  WEX believes most of its current customers are not aware of the company's previous identity as "Wright Express."  *Id.* ¶ 7.

WEX is currently valued at nearly $10 billion and services over 800,000 customers, offering an ecosystem of business-to-business solutions enabled by the company's global commerce platform, expertise in building personalized software solutions, and data-driven insights.  *Dearborn Decl.* ¶¶ 6, 9.  In 2023, WEX moved $225 billion in more than 20 currencies.  *Id.* ¶ 21.  WEX now sells a proprietary set of software solutions and technologies, including closed loop payment networks,

software with embedded payment solutions, and virtual payments capabilities. *Id.* ¶ 10. WEX also uses artificial intelligence (AI) to provide customers with insights, recommendations, scalable data, analytics, security, fraud prevention, and other features. *Id.* ¶ 11.

WEX categorizes its products into three segments: Benefits; Mobility; and Corporate Payments. *Id.* ¶ 13. WEX offers all three segments under the WEX brand. *Id.* WEX's Benefits segment offers software designed to simplify employee benefit management for plan administrators, employers, and plan participants and their families. *Id.* ¶ 14. WEX also offers software that allows employees to choose and enroll in their benefits and manage their benefits throughout the plan year. *Id.* WEX's Benefits software uses data analytics to help plan administrators and employers understand consumer usage and engagement. *Id.* ¶ 15. More than half the Fortune 1000 companies in the United States use WEX's Benefits software, and approximately 25 million people interact with the WEX platform in connection with their benefits. *Id.* ¶¶ 14-15.

In the Mobility segment, WEX aims to simplify the management of commercial vehicle fleets through software for analytics, reporting and controls, fuel cards, and other administrative tools. *Id.* ¶ 16. WEX differentiates its Mobility segment by offering enhanced data and controls using proprietary closed loop payment networks. *Id.* ¶ 17. WEX's Mobility customers also have access to an online platform featuring alternative payment and money transfer options, comprehensive settlement solutions, real-time reports, analytics, cost optimization, fuel reconciliation, and

mobile optimization tools. *Id.* WEX has thousands of Mobility customers, ranging from large corporations to small businesses to federal, state, and local government agencies. *Id.* ¶ 16.

In the Corporate Payments segment, WEX offers highly scalable and vertically integrated payments solutions that customers can integrate into their own technology and products. *Id.* ¶ 19. WEX is unique in the Corporate Payments space because it offers wholly owned, market leading technology along with a global issuing and funding capacity. *Id.* ¶ 18. WEX's Corporate Payments customers access WEX's products through a proprietary set of application programming interfaces (APIs). *Id.* ¶ 19.

WEX works with various stakeholders within a business to provide a fully integrated experience and platform. *Id.* ¶ 20. Specifically, WEX interacts with C-Suite executives—including Chief Executive Officers (CEOs), Chief Financial Officers (CFOs), Chief Human Resources Officers, and Chief Technology Officers (CTOs)—general managers, human resources personnel, procurement professionals, and information technology departments and executives. *Id.* Many of WEX's offerings are accessible via the internet and mobile applications, and the company currently offers 24 mobile applications on both the Google Play and Apple App stores. *Id.*

WEX continues to invest in AI, machine learning, and other tools to further the company's growth. *Id.* ¶ 21. WEX's longstanding history of delivering innovative, efficient, and reliable products has helped build its brand reputation. *Id.* ¶ 22. WEX

relies on its brand due to the sensitive nature of the information it handles on behalf of its customers, including payment data and personal health information.  *Id.*

WEX promotes its products and services using several websites incorporating the WEX name, including https://www.wexinc.com/ and https://www.wexcard.com. *Id.* ¶ 26; *see also Pl.'s Mot.*, Attach. 3, *WEX Webpages*.  Additionally, WEX promotes its brand on social media, including on X under the handle @WexIncNews, on Facebook under the name WEX, on Instagram under the handle @wexatwork, on LinkedIn as "WEX," and on YouTube under the handle @WEXIncNews.  *Dearborn Decl.* ¶ 26.  WEX also reaches its customer base through digital and email marketing, direct mail, tradeshows, brokers and consultants, and cold calling.  *Id.*  Over the past three years, WEX has spent more than $100 million on advertising.  *Id.* ¶ 25.  WEX's core marketing message is that it can "simplify the business of running a business" by helping customers overcome complexities, increase productivity, and reduce digital friction.  *Id.* ¶ 27.

WEX also promotes its brand through its annual "SPARK" conference, which brings together leaders from the Mobility, Corporate Payments, and Benefits segments.  *Id.* ¶ 28.  Beyond SPARK, WEX employees attend, host, and speak at events, tradeshows, and conferences.  *Id.*  WEX representatives have attended the Salesforce Annual Dreamforce Conference, AFP Annual Conference, and Coupa Customer Shows, among other conferences and tradeshows.  *Id.*  WEX has also received coverage from media outlets including CNBC and *The Guardian*.  *Dearborn*

*Rebuttal Decl.* ¶ 12.  Fortune previously named WEX as one of the 100 fastest growing public companies.  *Id.* ¶ 13.

WEX markets and distributes directly to customers, and the company relies on its partner channels to reach prospective customers.  *Dearborn Decl.* ¶ 30.  WEX's partners—which include third-party administrators, financial institutions, payroll providers, multinational oil companies, financial technology companies, and health plans—incorporate WEX's software into their own technology platforms within the Benefits, Mobility, and Corporate Payments spaces.  *Id.*  WEX works with its partners to assist them with deploying go to market strategies, and it outsources administrative services on behalf of certain partners.  *Id.*

WEX's customers and prospective customers operate in a variety of industries, including finance, banking, fintech, travel, technology, insurance, government, charge point operations, construction, fuel, benefits administration, and trucking and logistics.  *Id.* ¶ 29.  WEX's customers range from sole proprietorships to major corporations—including Booking.com, Expedia Group Inc., Verizon Communications, American Express Company, and Pepsi—to federal, state, and local government agencies.  *Id.*

The WEX brand is well-known in the United States and abroad, and the company has worked hard to earn the trust of the community, its customers, and their employees in order to further build the goodwill of the company.  *Id.* ¶ 34.  WEX has offices in thirteen countries, and its customers are located throughout the world,

including in the United States, Latin America, the United Kingdom, Europe, Asia, and Australia.  *Id.*

### 2.    HP Inc. and Hewlett-Packard Development Company, L.P.

HP was founded in 1939 by Bill Hewlett and Dave Packard.  *Defs.' Opp'n*, Attach. 19, *Decl. of Dan Salzman in Supp. of Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj.* ¶ 2 (*Salzman Decl.*).  The company developed its first "personal computer" in 1968 and its first laser jet printer in 1984.  *Id.*  Today, HP produces personal computing and other digital access devices, imaging and printing products, and related technologies, solutions, and services.  *Id.*  The HP brand is one of the world's most recognized and valuable brands and has consistently been ranked as a top global brand by consultancies like Interbrand and Ranking The Brands.  *Id.*

In its view, HP does not offer any of the products or services offered by WEX, nor does it consider WEX a competitor.  *Id.* ¶¶ 15-16.  HP does not view itself as competing with all software providers.  *Id.* ¶ 15.  Likewise, HP does not believe that consumers associate companies with one another based their use of the Software as a Service (SaaS) sales model, which refers to subscription-based software, as opposed to the sale of software on a disc or device.  *Id.*

HP protects its intellectual property.  The company previously opposed the trademark registration of "HP CONNECT" for use in connection with an "interactive website featuring technology that allows healthcare provider-users to check the eligibility, benefits, and claim status of their patients" on the ground that such a mark would generate a likelihood of confusion with HP's products.  *Dearborn Rebuttal Decl.*

¶ 43; *Pl.'s Reply*, Attach. 10, *HP's Notice of Opp'n to the Registration of "HP CONNECT"*. HP similarly opposed the registration of "HP ASSIST" for use in connection with software for cost estimation of "medical, dental, vision and other health care services and prescription drugs." *Dearborn Rebuttal Decl.* ¶ 44; *Pl.'s Reply*, Attach. 11, *HP's Notice of Opp'n to the Registration of "HP ASSIST"*. Both trademark applications have since been withdrawn and abandoned. *Dearborn Rebuttal Decl.* ¶¶ 43-44.

Since the 1990s, HP has been offering software services that enable technology managers to receive insights about their device fleets, defined as the full collection of technology devices connected to the business, including tablets, printers, and laptops.[2] *Salzman Decl.* ¶ 3. These software services are developed and marketed by HP's Workforce Solutions business unit. *Id.* ¶ 3. HP considers its competitors in the Workforce Solutions space to include VMWare, Ricoh, and Dell, not WEX. *Id.*; *Defs.' Opp'n*, Attach. 23, *HP Workforce Solutions Competitive Landscape Slide*. HP's Workforce Solutions business unit developed its Workforce Experience Platform (HP WEX),[3] the HP product at issue in this litigation. *Salzman Decl.* ¶ 12.

---

[2]    Both parties use the term, "fleet," to refer to different things. WEX uses the term to refer to fleets of motor vehicles, *see Dearborn Decl.* ¶ 16, while HP uses it to refer to fleets of technological devices. *See, e.g.*, *Salzman Decl.* ¶¶ 3, 8. To differentiate between these competing uses of "fleet," the Court uses "vehicle fleet" and "device fleet" throughout this order. At oral argument, counsel for both WEX and HP agreed that this shorthand differentiation is accurate.

[3]    HP refers to its Workforce Experience Platform both as "HP WEX" and simply as "WEX." *Compare Defs.' Opp'n*, Attach. 25, Press Release, HP Inc., HP Introduces New Services and Software that Turbocharge Productivity and Accelerate a Circular Future (Mar. 7, 2024) (*HP WEX Press Release*) ("These new solutions include HP WEX . . .."), *with id.* ("WEX launches with an intuitive user interface . . .."). To differentiate HP's product from Plaintiff WEX, the Court uses "WEX" to refer to the Plaintiff and "HP WEX" to refer to HP's software. However, the Court recognizes that "HP WEX" is not universally used by HP and that HP is attempting to trademark "WEX" standing alone.

**B.      HP's Workforce Experience Platform**

In 2023, HP began to develop software to compete with other technology companies' Workplace Experience and Digital Employee Experience applications. *Id.* ¶ 4. The consulting company Gartner describes Workplace Experience, or WEX, applications as "a discrete application, well-defined module or cohesive set of capabilities that supports various aspects of the journey as employees interact with the office or corporate hosted workplaces," which are designed to "simplify the process of planning a visit, reserving available space and determining what amenities are provided." *Defs.' Opp'n*, Attach. 30, TORI PAULMAN ET AL., GARTNER INC., MARKET GUIDE FOR WORKPLACE EXPERIENCE APPLICATIONS 3 (2023) (*Gartner WEX Report*). According to Gartner, a Digital Employee Experience, or DEX, application allows companies to "measure and continuously improve the performance of and employee sentiment toward company-provided technology." *Id.*, Attach. 31, DAN WILSON ET AL., GARTNER INC., MARKET GUIDE FOR DEX TOOLS 2 (2023) (*Gartner DEX Report*). DEX applications also "help IT leaders improve the digital employee experience and shift focus from technology management to more business-value-added work." *Id.*

In March 2024, HP announced the launch of HP WEX, a workforce experience and cybersecurity product for HP's enterprise clients. *Salzman Decl.* ¶ 5. HP WEX is designed to streamline technology updates, strengthen the cybersecurity of employees' endpoint connected devices—including laptops, tablets, and printers— and provide Chief Information Officers (CIOs) with data analytics and employee sentiment about the "fleet" of devices they manage. *Id.* Due to these capabilities, HP

targets HP WEX at CIOs and other executive-level information technology (IT) managers whose responsibilities include the maintenance and development of their company's hardware and software infrastructure and ensuring the cybersecurity of the same. *Id.* Since HP WEX is a tool for IT administrators managing a large number of devices, HP is planning to sell the software to its largest enterprise customers as pre-installed software on devices purchased from HP. *Id.*

HP WEX includes a unique and proprietary AI feature that employs company-specific data about employee usage of endpoint devices to help CIOs monitor and determine when to fix or upgrade the devices and software they manage. *Id.* ¶ 7. HP plans to add features to HP WEX that will help CIOs determine when an anomaly exists on a device and the root cause of the anomaly, and help employees troubleshoot their own device support issues. *Id.* HP does not plan to add any financial services features, including payment support systems, to HP WEX. *Id.*

On March 7, 2024, HP announced HP WEX as one of several "new and enhanced services and solutions that drive value and enable partners to build and grow their services and software businesses." *Defs.' Opp'n*, Attach. 25, Press Release, HP Inc., HP Introduces New Services and Software that Turbocharge Productivity and Accelerate a Circular Future (Mar. 7, 2024) (*HP WEX Press Release*). During the same time period, HP highlighted HP WEX at the HP Amplify Partner Conference, the company's largest partner conference attended by more than 1,500 HP partners from 95 countries. *Salzman Decl.* ¶ 19.

In a March 7, 2024 blog post describing HP WEX, HP called the software "an AI-enabled digital experience platform that unlocks the full potential of the workforce and helps transform employees into a force for growth." *Pl.'s Mot.*, Attach. 4, Faisal Masud, *Delivering Exceptional Employee Experiences with WEX, HP's New AI-Enabled Digital Experience Platform*, HP: PRESS BLOG (Mar. 7, 2024) (*HP WEX Blog Post*). The HP WEX website lists "[f]leet management" as one of the platform's "[c]apabilities," and markets the software as being "[f]or IT leaders who want to lead transformation, drive cost reduction, and better enable business results" and "[f]or IT managers and admins who want to reduce manual work for their teams." *Pl.'s Mot.*, Attach. 6, *HP WEX Website* at 10, 26. According to HP, "fleet" is commonly used in the information technology industry to refer to technology devices, such as computing and other digital access devices, imaging and printing products, and related hardware peripherals. *Salzman Decl.* ¶ 8.

After announcing HP WEX, HP publicly solicited businesses to apply to participate in the private beta launch of HP WEX, scheduled to begin in June 2024, and dozens of applicants expressed interest. *Id.* ¶ 10. More than two dozen companies are participating in the private beta launch of HP WEX; none expressed confusion about the product's source. *Id.* HP plans to conduct a public beta launch of HP WEX in September 2024 and launch the full product to the public in March 2025. *Id.*

HP currently anticipates that at least 80% of HP WEX purchasers will be existing HP customers, in part because HP intends to sell HP WEX software as a

bundle with HP computers. *Id.* ¶ 11. HP also intends to price HP WEX between $999,999 and $10,000,000. *Id.* The sales process for HP WEX will take at least six months. *Id.* This process will be split into two phases: 1) the "discovery phase," during which the customer will conduct due diligence on the software; and 2) the "financial quoting" phase, during which HP and the customer will negotiate a sales price and eventually sign a contract of sale. *Id.*

HP spent approximately nine months considering how to brand HP WEX. *Id.* ¶ 12. Ultimately, HP chose "Workforce Experience Platform" as the name for its new software because in designing the software, HP sought to help CIOs focus on the needs of their workforce to improve morale and productivity by creating a seamless and frictionless employee experience. *Id.* HP also wanted the name of HP WEX to mirror the Workforce Solutions business unit to allow the company to leverage existing branding. *Id.* HP spent approximately $250,000 on choosing a brand for HP WEX, and more than a dozen individuals were involved in picking the name. *Id.* HP's Workforce Solutions business unit was not aware of WEX's products and services when it selected the HP WEX brand. *Id.* ¶ 13.

Since announcing HP WEX in March 2024, HP has been marketing the software through the HP WEX website, press releases, promotional videos, and industry events. *Id.* ¶ 14. HP has also promoted HP WEX on LinkedIn and YouTube. *Dearborn Decl.* ¶ 38. HP is not aware of anyone expressing confusion about whether HP WEX is related to WEX, or vice versa, even though the HP WEX website has received thousands of unique visitors and press releases about HP WEX have had

thousands of unique readers.  *Salzman Decl.* ¶ 14.  In advertising materials, like the section of the HP WEX website reproduced below, HP refers to HP WEX simply as "WEX":



*Dearborn Decl.* ¶ 38.

The launch of HP WEX has received media coverage both in the United States and internationally.  *Dearborn Decl.* ¶ 43; *Pl.'s Mot.*, Attach. 8, *Examples of HP WEX Media Coverage* (*HP WEX Media Coverage*).  Some of these media reports refer to HP WEX as "WEX" standing alone.  *Dearborn Decl.* ¶ 46; *HP WEX Media Coverage* at 1. One article, published by Investing.com, associated WEX's stock ticker with HP WEX. *Pl.'s Mot.*, Attach. 9, *Investing.com Article*.

HP has invested nearly $14 million into HP WEX, and a preliminary injunction would cause the company to incur significant losses and irreparable damage to its goodwill and reputation from any abrupt halt of the launch schedule and from having to rebrand.  *Salzman Decl.* ¶ 19.  It would take HP between three and six months to select a new brand name for HP WEX, and rebranding would cost over $500,000.  *Id.* A rebrand would also require HP to spend millions of dollars on marketing activities.

*Id.* HP suggests that rebranding HP WEX would not be in the public interest because consumers may be confused or misremember the product. *Id.* ¶ 20.

### C.    The Trademarks At Issue

WEX owns incontestable trademarks for "WEX," "WEXONLINE," and a previous version of its logo, reproduced below:



*Dearborn Decl.* ¶ 24; *Pl.'s Mot.*, Attach. 2, *WEX Trademark Registration Certificates.* WEX also has pending registrations for "10-4 BY WEX" and its current logo, reproduced below:



*Dearborn Decl.* ¶ 24; *WEX Trademark Registration Certificates.*

Although other companies use trademarks that include "WEX," such as "WEX CONNECT" and "WEX WHEEL," WEX is not aware of any companies with a national reach registering marks containing "WEX" standing alone in connection with the types of products and services offered by WEX. *Dearborn Decl.* ¶ 48; *Defs.' Opp'n*, Attach. 14, *TSDR Status Page for "WEX CONNECT"*; *id.*, Attach. 15, *TSDR Status*

*Page for "WEX WHEEL".*  WEX has consistently acted to protect its trademarks in the past, and the company has a co-existence agreement with the third party using "WEX CONNECT" and "WEX WHEEL." *Dearborn Decl.* ¶ 49.  Although IBM once planned to release a "WEx" platform, the company apparently abandoned the project in March 2024. *Dearborn Rebuttal Decl.* ¶ 47.  Should the project be revived, WEX will oppose IBM's use of "WEx." *Id.* ¶ 47 n.22.

In December 2023, HP filed a trademark application for "WEX" standing alone. *Salzman Decl.* ¶ 13; *Pl.'s Mot.*, Attach. 5, *HP Trademark Application for "WEX".*  A trademark examiner has since conducted a search of the U.S. Patent & Trademark Office (USPTO) database of registered and pending marks, finding no conflicting marks that would prevent registration of HP's WEX trademark. *Id.*  According to HP's counsel at oral argument, HP believed its pending trademark application for "WEX" would not infringe on WEX's marks because, in HP's view, the two companies operate in different industries, or "silos."

In response to HP's attempted registration of "WEX," WEX filed a letter of protest with the USPTO.  *Dearborn Rebuttal Decl.* ¶ 42; *Pl.'s Reply*, Attach. 9, *Correspondence Between WEX and the USPTO* (*WEX-USPTO Correspondence*).  WEX will continue to oppose HP's application should it proceed beyond an ex parte examination. *Dearborn Rebuttal Decl.* ¶ 42.

In addition to seeking a trademark for "WEX" standing alone, HP is using the following logo for HP WEX:



*Defs.' Opp'n* at 6.

### D.   Survey Evidence

#### 1.   The Butler Survey

In support of its motion for preliminary injunction, WEX submitted the results of a survey conducted by Sarah Butler, Senior Managing Director at National Economic Research Associates, Inc. (NERA).[4]  *Pl.'s Mot.*, Attach. 11, *Decl. of Sarah Butler in Supp. of Pl.'s Mot. for a Prelim. Inj.* ¶ 40 (*Butler Decl.*); *id.*, Attach. 12, *Complete Butler Survey Questionnaire*; *id.*, Attach. 13, *Butler Survey Desktop Screenshots*; *id.*, Attach. 14, *Butler Survey Mobile Screenshots*; *id.*, Attach. 15, *Butler Survey Invitation*; *id.*, Attach. 16, *Butler Survey Stimuli*; *id.*, Attach. 17, *Butler Survey Final Data.*  Ms. Butler's survey (Butler Survey) was designed to test whether HP's use of "WEX" is likely to cause consumers to believe that WEX's products and services are 1) produced or offered by HP, 2) associated or affiliated with HP, or 3) licensed by HP.  *Butler Decl.* ¶ 1.

To qualify for the Butler Survey, respondents had to own, or be a full-time employee of, a company with fifty or more employees.  *Id.* ¶ 2.  In addition, all respondents were classified as potential customers of WEX and potential advertising

---

[4]      NERA is firm that provides statistical, survey, economic, and financial research analysis.  *Butler Decl.* ¶ 40.  In addition to serving as a Senior Managing Director, Ms. Butler chairs the firm's Survey Research and Consumer Behavior practice and is a member of the Intellectual Property and Antitrust practices.  *Id.*

targets for HP WEX because they were responsible for selecting both their company's internet-connected devices and at least one type of product offered by WEX.[5]  *Id.* ¶ 12.  A total of 374 respondents completed the survey after meeting the screening criteria.  *Id.* ¶ 14.  In addition to screening questions, the survey used a number of quality control measures.[6]  *Id.* ¶¶ 13, 15.

The Butler Survey employed a *Squirt* survey methodology with test and control groups, a design chosen by Ms. Butler to determine whether HP's use of "WEX" causes confusion by holding constant all other elements that might cause consumer confusion, including webpage design, webpage colors, and similarity of services.  *Id.* ¶ 3.  Survey respondents were randomly assigned to either the test group or the control group.  *Id.* ¶ 18.  Respondents in the test group were shown a screenshot of the HP WEX website, while respondents in the control group were shown the same webpage with all instances of "WEX" changed to "WEP."[7]  *Id.*  All respondents were then shown, in a random order, WEX's webpage and webpages for three of WEX's competitors—Stripe, Alegeus, and Corpay—which were meant to serve as distractors. *Id.* ¶ 19.

---

[5]     Specifically, respondents had to indicate they were responsible for selecting their company's internet-connected devices and at least one of the following functions: 1) selecting API software or services for processing payments to vendors or suppliers; 2) selecting service providers, technology solutions, or platforms for managing employee benefits; 3) selecting operational and expense management solutions for businesses that use vehicles, or fleets of vehicles, in their daily operations; or 4) selecting management software or solutions, such as payment cards, for over-the-road trucking fleets.  *Butler Decl.* ¶ 16.

[6]     These include, among other things, digital fingerprinting, used to exclude individuals who attempt to take a survey twice, reCAPTCHA questions, used to screen out bots attempting to take the survey, and industry screeners, used to flag respondents who may possess specialized knowledge about the survey topic or methodology.  *Butler Decl.* ¶¶ 13, 15.

[7]     Ms. Butler used "WEP" for the control group because it is another realistic abbreviation for "Workforce Experience Platform."  *Butler Decl.* ¶ 3.

After viewing all five webpages, respondents were asked whether they believed any of the products or services shown on the WEX webpage or the distractor webpages were from the same company as the company they saw first.  *Id.*  Respondents who answered "Yes" were asked to select the products or services they believed were from the company they saw first and to explain each selection in an open-ended question. *Id.*  Afterwards, respondents completed two additional question sets, which respectively asked whether they believed any of the products or services shown on the WEX webpage or distractor webpages were affiliated with or licensed by the company they saw first.  *Id.* ¶¶ 20-21.

In total, 53.8% of respondents in the test group indicated they believed the WEX webpage was from, associated with, or licensed by HP.[8]  *Id.* ¶ 38.  In the control group, 33% of respondents indicated they believed the WEX webpage was from, associated with, or licensed by HP.  *Id.*  By subtracting the control group's rate of confusion from that of the test group, Ms. Butler concluded that 20.8% of respondents were confused solely by HP's use of "WEX" and erroneously believed that WEX was the same company as HP, associated or affiliated with HP, or licensed by HP.  *Id.* ¶ 5.  Ms. Butler maintains the results of her survey provide strong evidence that consumers are likely to be confused by HP's use of "WEX" and assume that WEX's products and services are connected with HP.  *Id.*

---

[8]     To arrive at this figure, Ms. Butler calculated the number of unique selections of WEX across all three question sets, ensuring that respondents were not double counted if they associated WEX with HP in more than one question set. *Butler Decl.* ¶ 38.

### 2.    HP's Criticisms of the Butler Survey

While HP did not submit survey evidence of its own, it did offer several criticisms of the Butler Survey from Laura O'Laughlin, a Principal at Analysis Group, Inc. *Defs.' Opp'n*, Attach. 36, *Decl. of Laura O'Laughlin in Supp. of Defs.' Opp'n Br.* ¶ 1 (*O'Laughlin Decl.*). Ms. O'Laughlin characterizes the Butler Survey as "fundamentally flawed and not reliable for the purpose of measuring whether and to what extent confusion exists between the WEX and HP WEX marks." *Id.* ¶ 15. Ms. O'Laughlin suggests the Butler Survey "does not provide any evidence of a likelihood of reverse confusion." *Id.*

Ms. O'Laughlin opines that the Butler Survey has limited value because the trademarks at issue are not "competitively proximate," meaning it is unlikely the same consumers will encounter them in the marketplace. *Id.* ¶ 14. In addition, Ms. O'Laughlin explains that the *Squirt* survey design used in the Butler Survey is typically employed when the senior mark is weak or not easily accessible in memory, yet here, WEX alleges that its family of marks is strong. *Id.* ¶ 19.

Next, Ms. O'Laughlin suggests the Butler Survey merely asks respondents to play a "matching game" by using a two-room survey design and instructing respondents to look for similarities with the HP WEX webpage. *Id.* ¶ 20. Ms. O'Laughlin reinforces this characterization by noting that the survey allowed respondents to re-review the HP WEX webpage before deciding if any of the other

webpages were similar.[9]  *Id.*  Ms. O'Laughlin further suggests that high levels of confusion in the control group indicate survey respondents actually played the "matching game" she identifies.  *Id.* ¶ 22.  After conducting her own analysis of the Butler Survey, Ms. O'Laughlin arrives at a net confusion rate of 16.4%, only taking into account respondents who 1) never re-reviewed the HP WEX webpage or 2) associated WEX with HP WEX before re-reviewing the HP WEX webpage.  *Id.* ¶ 25.

Ms. O'Laughlin also submits that the Butler Survey's use of leading questions encouraged respondents to hunt for associations between the webpages.  *Id.* ¶ 26.  After reviewing some responses to the Butler Survey's open-ended questions, Ms. O'Laughlin surmises that respondents were simply connecting "WEX" to "WEX" without giving any thought to HP's involvement.  *Id.* ¶ 27.  Ms. O'Laughlin submits that real-world consumers might not make similar associations.  *Id.* ¶ 28.

Ms. O'Laughlin next takes issue with the chosen distractor webpages, noting that they are "obviously different" from "WEX" and "WEP" and are therefore relatively weak distractors that fail to disguise the researcher's desired match.  *Id.* ¶ 30.  She suggests the Butler Survey should have used webpages for "WIX," "WX," or "WX Technology Group" as distractor webpages.  *Id.*

Beyond these design flaws, Ms. O'Laughlin notes that the population for the Butler Survey should have been restricted to WEX customers.  *Id.* ¶ 31.  She accuses the Butler Survey of mistakenly assuming that WEX's customers and HP WEX's

---

[9]      According to Ms. O'Laughlin's analysis of the Butler Survey, 25.8% of respondents in the test group and 29.3% of respondents in the control group re-reviewed the HP WEX webpage at least once after being presented with the array of stimuli.  *O'Laughlin Decl.* ¶ 23.

customers have overlapping job responsibilities. *Id.* ¶ 33. Analyzing data from the Butler Survey, Ms. O'Laughlin concludes that nearly 40% of respondents selected all seven, or six of the seven, job responsibilities listed and submits that respondents were overinclusive in describing their job responsibilities. *Id.* ¶ 35. In Ms. O'Laughlin's view, the Butler Survey "fails to properly define the target population and samples a group of respondents that are not clearly WEX Inc. customers or HP WEX customers." *Id.* ¶ 40 (emphasis omitted).

Finally, Ms. O'Laughlin argues the Butler Survey failed to account for respondents' level of confidence in their answer choices. *Id.* ¶ 41. Ms. O'Laughlin reads the fact that many respondents associated multiple webpages with the HP WEX website to mean that respondents were merely guessing at associations, a conclusion she believes is reinforced by some responses to the survey's open-ended questions. *Id.* ¶¶ 42-43. As a result of respondent guessing, Ms. O'Laughlin suggests the level of confusion suggested by the Butler Survey is inflated. *Id.* ¶ 44.

### 3.   WEX Inc.'s Response to HP's Criticisms

In reply, Ms. Butler asserts that Ms. O'Laughlin's "critiques are without merit and do not undermine the reliability of the results" of the Butler Survey. *Pl.'s Reply*, Attach. 13, *Rebuttal Decl. of Sarah Butler in Further Supp. of Pl.'s Mot. for a Prelim. Inj.* ¶ 5 (*Butler Rebuttal Decl.*).

Initially, Ms. Butler explains that her survey was designed to "replicate a world in which [HP's use of "WEX"] is substantially present." *Id.* ¶ 9. Ms. Butler further submits that "[f]or reverse confusion to occur . . . consumers need to believe

that the senior user's goods are those of the junior user – they do not need to actually purchase products or services from HP." *Id.* ¶ 12 (emphasis omitted). Ms. Butler clarifies that she screened not for potential purchasers of HP WEX, but for potential purchasers of WEX's products who could be exposed to HP WEX advertising. *Id.* Ms. Butler also points out that HP WEX is already being marketed through the HP WEX website, meaning that the Butler Survey replicated the circumstances under which consumers are exposed to HP WEX. *Id.*

Regarding the critique of her survey as a "matching game," Ms. Butler avers that "a survey in which respondents are shown the allegedly infringing brand/trade dress and, then, after a short delay, are shown a line-up of other brands, including the product at-issue 'is an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses.'" *Id.* ¶ 15 (quoting 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:177 (5th ed. 2022)). Further, Ms. Butler suggests respondents were not simply matching "WEX" to "WEX," noting that 15.6% of respondents in the test group selected one of the distractor webpages and not WEX. *Id.* ¶ 16. In addition, Ms. Butler suggests that respondents who were matching "WEX" to "WEX" were filtered out by the control group, since "WEX" is the closest match for "WEP." *Id.* ¶ 17.

With respect to allowing respondents to re-review the HP WEX webpage, Ms. Butler responds that consumers in the real world can move back and forth between webpages. *Id.* ¶ 20. In Ms. Butler's opinion, "repeated views of HP's 'WEX' webpage

24

may better simulate 'market saturation' wherein consumers would likely be exposed to the junior user's mark numerous times." *Id.* ¶ 20 n.29. Further, Ms. Butler submits that the sample sizes used by Ms. O'Laughlin to assert that rates of confusion were higher among respondents who re-reviewed the HP WEX webpage are "well below the threshold that courts typically require to draw reliable conclusions." *Id.* ¶ 22. Even if respondents who re-reviewed the HP WEX webpage were excluded from the sample, Ms. Butler continues, the net confusion rate would still be 16.4%, above the threshold relied upon by courts in determining a likelihood of confusion. *Id.* ¶ 23.

Regarding the phrasing of the survey questions, Ms. Butler responds that the questions were clear, and Ms. O'Laughlin "did no empirical testing to show that the different questions she identifies would have led to different results." *Id.* ¶ 25. Ms. Butler also notes that control group respondents were shown the same questions, thus any effect would be cancelled out by the control group. *Id.* Finally, Ms. Butler points out that, even accepting Ms. O'Laughlin's critique, the questions do not encourage respondents to associate any particular webpage with HP WEX. *Id.*

Addressing the argument that respondents were guessing, Ms. Butler again maintains that the control group accounts for this possibility. *Id.* ¶ 28. Ms. Butler also disputes Ms. O'Laughlin's suggestion that a large percentage of respondents in the control group were confused, noting Ms. O'Laughlin provided no evidence that the percentages were larger than what would normally be expected. *Id.* ¶ 29.

Turning to her choice of distractors, Ms. Butler explains she was trying to replicate marketplace conditions and "[e]xisting literature on the topic of distractors

does not claim that distractors must have similar names or that they must accompany any specific elements of the junior and senior user[']s marks." *Id.* ¶¶ 30-31.  In Ms. Butler's view, "[i]f the distractor webpages were truly ineffective, it is unlikely that nearly 40 percent of respondents would have indicated some association between these distractor webpages and HP's webpage for 'WEX.'"  *Id.* ¶ 32.

Returning to the survey's respondents, Ms. Butler asserts that she "would not have been able to identify qualified respondents" if the customer bases for WEX and HP WEX did not in fact overlap.  *Id.* ¶ 36.  Ms. Butler further points out that Ms. O'Laughlin did not cite empirical evidence indicating that the same employee is unlikely to have many of the job responsibilities listed in the screening criteria.  *Id.* ¶ 39.  According to Ms. Butler, even if respondents who selected all seven, or six of seven, listed job responsibilities are excluded from the results, the net rate of confusion does not meaningfully change.  *Id.* ¶¶ 40-42.

### E.   Procedural Posture

On March 27, 2024, WEX sent a letter to HP, which demanded that HP stop infringing on WEX's trademarks.  *Dearborn Decl.* ¶ 51; *Pl.'s Mot.*, Attach. 10, *Correspondence Between WEX and HP*.  On March 28, 2024, a WEX board member met with HP's Chief Digital and Transformation Officer, who oversees HP WEX, to reinforce WEX's concerns.  *Dearborn Decl.* ¶ 51.  On April 3, 2024, HP sent a letter to WEX, in which it did not agree to cease using "WEX."  *Id.*; *Correspondence Between WEX and HP*.  This suit followed.

26

### III.    THE PARTIES' POSITIONS

#### A.    WEX Inc.'s Motion for Preliminary Injunction

WEX first asserts that "the WEX mark is valid and protectable" because "WEX owns multiple federal trademark registrations for the WEX mark, all of which have become incontestable pursuant to 15 U.S.C. § 1065." *Pl.'s Mot.* at 9 (capitalization altered).  Further, according to WEX, "HP's use of WEX is likely to cause consumer confusion." *Id.* (capitalization altered).  WEX submits that all eight of the factors used to assess likelihood of confusion weigh in its favor. *Id.* at 10.

Regarding the similarity of the marks, WEX initially notes that HP's "WEX" mark "is the same three-letter word, pronounced the same way." *Id.*  In WEX's view, "[r]everse confusion is particularly likely here because both parties offer business software platforms" and "[e]ven where HP uses 'HP WEX'—and not WEX standing alone—consumer confusion is likely because consumers will believe that WEX is not an independent company, but rather part of HP." *Id.* at 10-11.  After surveying First Circuit caselaw, WEX observes that "[c]ourts in this Circuit routinely recognize that a massive, well-resourced junior user like HP only increases likelihood of confusion by associating WEX with its house brand." *Id.* at 11.  WEX further submits that "HP's stylized logo for its 'WEX' software does nothing to dispel confusion" because "WEX remains easily legible as the prominent feature of HP's 'WEX' logo, and both parties' logos share similarities, including the use of thick, block letters and geometric designs." *Id.*

27

Turning to the similarity of the parties' goods and services, WEX maintains the "WEX-branded services are similar," *id.* at 12 (capitalization altered), because "the parties are both offering business-focused software solutions under the exact same mark," *id.*, and "[p]roducts sold under similar marks need not be identical to engender confusion." *Id.* (quoting *Anheuser-Busch, Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105, 118 (D.N.H. 2003)). WEX points out it "is widely synonymous with 'fleet management,' making HP's use of the term 'WEX' with its own 'fleet management' solution even more likely to cause confusion." *Id.* WEX further avers that HP's marketing materials and trademark application indicate that HP WEX may be expanded to "cover other business logistical software that could more directly overlap with the software WEX has offered for decades." *Id.* at 13. In WEX's view, "HP's broad, generic descriptions of its 'WEX' platform—through press releases, marketing, job postings, and more—all contribute to a reasonable public perception that HP's 'WEX' services overlap with WEX's." *Id.*

Next, WEX avers that both it and HP "are marketing their WEX-branded services through the same advertising channels, with the same advertising message, to the same types of customers." *Id.* at 14. WEX claims that "[b]oth parties advertise their software and services through corporate conferences, trade shows, websites, and social media," and "[b]oth have advertised their WEX platforms as a means of increasing productivity, unlocking the 'full potential' of [] customers, and seamless integration capabilities." *Id.* WEX further submits that "[a]t least one early customer of HP's 'WEX' is also a customer of WEX, demonstrating the actual overlap of the

parties' customer bases." *Id.* Even within a particular company, WEX argues that purchases of the parties' products "will involve the same executives: IT departments, chief operating officers, HR professionals, and other senior executives." *Id.* WEX suggests that "[e]mployees in these overlapping roles at the parties' overlapping customers are highly likely to encounter both the original WEX-branded services and software as well as HP's new 'WEX' software." *Id.* at 14-15.

Turning to actual confusion, WEX submits that "[d]espite the short time since HP's announcement about its 'WEX' platform, there has already been evidence of confusion in the market." *Id.* at 15. Noting the publication of an article associating HP WEX with WEX's stock ticker, WEX argues "[c]onfusion in the press is relevant actual confusion because WEX's commercial interest in the WEX mark will be threatened if journalists lead the public to believe that HP's product is associated with WEX's stock." *Id.* at 15 (internal quotation omitted). WEX maintains that the "reality of actual confusion in the market is reinforced by the results of Ms. Butler's consumer perception survey, which resulted in a significant showing of roughly 21% net confusion." *Id.* at 16.

With respect to HP's intent in adopting the WEX mark, WEX points out that it "owns multiple incontestable registrations for the WEX trademark, including in the same classes as HP has applied to register its own identical WEX mark." *Id.* WEX continues, "[i]f HP failed to identify WEX's many WEX incontestable trademark registrations before seeking to register the WEX trademark and launching its infringing WEX platform, its failure to do appropriate diligence is inexcusable." *Id.*

In WEX's view, "HP's 'use of a mark which is the same or confusingly similar to [WEX's] mark as stated in its federal registration certificate[s] cannot be justified by a claim of coincidence, good faith or lack of knowledge on the part of [HP].'" *Id.* (alterations in original) (quoting *Veryfine Prods., Inc. v. Colón Bros.*, 799 F. Supp. 240, 250 (D.P.R. 1992)).

Concluding its discussion of likelihood of confusion, WEX argues that, as "an arbitrary mark for all of the goods and services that both WEX and HP are using the mark," WEX is a strong mark. *Id.* at 17. WEX disputes HP's claim that "WEX" is an acronym for "workforce experience," arguing that an "acronym or initialism is only descriptive where the wording it stands for is merely descriptive, and is readily understood by relevant purchasers to be substantially synonymous with the merely descriptive wording it represents." *Id.* (internal quotation omitted). Further, according to WEX, the "WEX brand has been used for decades," WEX has "invest[ed] nearly $100 million in U.S. advertising over the past three years," and "WEX has policed the field and there are no relevant third-party uses of WEX standing alone." *Id.* at 17-18.

WEX next avers that because it "is likely to succeed on the merits," it also "is entitled to a statutory presumption of irreparable harm." *Id.* at 18. WEX further submits that it will in fact be irreparably harmed absent a preliminary injunction because the "potential for negative consumer comments or backlash, and perceived affiliation and confusion by consumers, businesses, investors, and the public alike are all a detriment to the brand loyalty, trust, reputation and goodwill that WEX has

built for decades." *Id.* at 19.  In WEX's view, the harm to its "reputation and goodwill that would result if WEX loses control of its brand to HP cannot be quantified." *Id.*

WEX concludes its motion with a brief discussion of the balance of hardships and public interest.  *Id.* at 19-20.  In WEX's view, "[t]he balance of hardships tips decidedly in WEX's favor, as it has invested decades of work in building goodwill in the WEX brand, while HP has only just launched its WEX product" and "can easily rebrand." *Id.* at 19.  Finally, WEX submits that "the public interest will be served by ensuring that HP is not permitted to infringe WEX's trademarks and create confusion over the source of WEX-branded services." *Id.* at 20.

### B.    HP Inc. and Hewlett-Packard Development Company, L.P.'s Response in Opposition

In response, HP initially notes that it "does not challenge the validity of Plaintiff's marks" for purposes of this motion.  *Defs.' Opp'n* at 5 n.3.  Nevertheless, HP maintains that each of the factors used to assess likelihood of confusion "weighs decisively against any likelihood of confusion." *Id.* at 5.

First, HP argues the "parties' marks are distinct" because "the total effect in the marketplace differs significantly." *Id.* at 6.  HP submits that its logo for HP WEX "focuses on upper case lettering, black font, and stylization to the letter 'W,'" while WEX's logo "focuses on lower case letters, red text, and stylization to the letter 'X.'" *Id.* at 1.  HP further claims it "uses its house mark 'HP' with the WEX mark," which "dispels any appreciable confusion." *Id.* at 6.  HP then attempts to distinguish the cases relied upon by WEX, arguing that "[t]his is not a situation where HP's use of its house mark would aggravate confusion because there is no likelihood of confusion

31

given the distinct marks, goods and services, and sophisticated purchasers." *Id.* at 7. In HP's view, "the parties' marks have distinct meanings that relate to their goods and services," with HP's mark being an acronym for "Workforce Experience Platform" and WEX's mark being an acronym for "Wright Express." *Id.*

Next, HP asserts that "the products at issue are only similar insofar as they relate to software, generally." *Id.* at 8. According to HP, "[w]hat each software product does and why it is useful to its respective consumers differ so much as to render the better analogy to be one of jet planes to roller blades, which are similar insofar as they both provide transportation." *Id.* (emphasis omitted). HP maintains that "[i]n today's digital economy, that a product is 'software' or even 'software as a service' is not an effective differentiator." *Id.*

HP describes HP WEX as "a software product designed to allow CIOs to manage endpoint computer devices." *Id.* at 9. HP further submits that "Plaintiff's software does not offer any of HP WEX's functionality for endpoint device management and cybersecurity," and instead "Plaintiff's solutions target making payments easier for its business clients." *Id.* In HP's view, WEX's focus on the parties' use of the word, "fleet," is also "misplaced because they refer to two different things." *Id.* at 9 n.4. HP represents that "fleet" is "widely understood in [the technology] industry to refer to devices and would not be confused with a fleet of two-ton trucks," and "Plaintiff offers no evidence that the executives it interacts with would be confused because of the word 'fleet.'" *Id.*

Adding to the products' dissimilarity, HP continues, is the fact that WEX "markets itself as a 'commercial banking company,'" whereas HP "manufactures, markets, and sells computer hardware and related software." *Id.* at 8-9.  Relatedly, HP notes that "government agencies and industry researchers do not classify Plaintiff and HP as existing in the same market or being competitors." *Id.* at 10.  According to HP, the similarity of the goods factor "decisively weighs against Plaintiff." *Id.*

Shifting away from the products themselves, HP argues "[t]he parties' advertising, channels of trade, and prospective sophisticated customers are dissimilar." *Id.*  HP submits that the target purchasers of HP WEX are CIOs, whereas WEX "claims to target C-Suite executives, procurement professionals, and HR personnel." *Id.* at 10-11.  Although WEX claims to sell to "a broad category of business executives," HP maintains this assertion "is effectively meaningless given that companies are 'composed of separate departments with diverse purchasing requirements.'" *Id.* at 11 (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983)).

"Even if the parties were to have overlapping customers," HP continues, these "customers are sophisticated, making confusion unlikely." *Id.* at 12.  HP submits that "HP WEX customers may take six months or more evaluating the software before purchasing it and will be expected to spend between six and eight figures . . . to acquire it." *Id.*  HP also disputes WEX's argument that "the parties' advertising and trade channels are the same because they both advertise through websites and social media," arguing "that kind of advertising is not useful for assessing likelihood of

confusion." *Id.*  Further, HP represents that it "is not aware of Plaintiff attending any of the same conferences as HP, let alone having employees speak on the same panel or hosting a trade show booth on the same expo floor." *Id.* at 13.

Turning to WEX's arguments concerning actual confusion, HP represents it "has been promoting HP WEX for more than two months to thousands of potential customers and has already garnered extensive engagement, yet not a single consumer has been confused." *Id.* at 13.  HP further avers "the article Plaintiff relies on was created using generative artificial intelligence," and therefore "no person . . . was confused." *Id.* at 13-14 (emphasis omitted).  "[E]ven if this were an isolated example of purported confusion," HP continues, "it is not sufficient to show that an appreciable number of consumers were confused." *Id.* at 14 (emphasis omitted).

Further, in HP's view, the Butler Survey is "fundamentally flawed" and "does not demonstrate any actual confusion." *Id.*  HP identifies five alleged shortcomings with the Butler Survey.  First, HP argues the survey used an incorrect format. *Id.* Second, HP claims the survey's methodology fails to "reflect the circumstances in which consumers encounter Plaintiff's and HP's marks," rendering the survey a mere "matching game." *Id.*  Third, HP accuses the survey of using "leading questions that encouraged respondents to hunt for associations." *Id.* at 15.  Fourth, HP maintains the survey did not "test the relevant population" and was "predicated on the incorrect assumption that the same individuals would be potential customers of both parties." *Id.*  Finally, HP asserts the survey did not "control for respondent certainty in their 'confusion,' effectively counting respondents as 'confused' when they were guessing."

*Id.*  Because of these alleged deficiencies, HP suggests the results of the Butler Survey actually "confirm that there is no likelihood of confusion."  *Id.*

With respect to its intent in adopting the WEX mark, HP insists it "adopted its mark in good faith to relate to its services" and WEX "presents no evidence that HP intentionally used the WEX mark to ride on Plaintiff's goodwill."  *Id.*  HP also disputes WEX's argument "that the mere fact that [WEX] owns registrations for the WEX mark supports a finding of bad faith," *id.*, averring that "[b]ad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks."  *Id.* at 16 (quoting *Unleashed Doggie Day Care, LLC v. PetCo Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 395 (D. Mass. 2010)).

Ending its discussion of likelihood of confusion by addressing the strength of WEX's mark, HP first submits that "[c]ourts have found trademarks that are acronyms to be generally weak marks."  *Id.*  HP further accuses WEX of failing "to introduce sufficient evidence that its trademark is anything other than a weak mark," and points out that "other companies have registered or use a WEX mark or similar marks, including for financial and software-related goods and services."  *Id.* at 17. According to HP, there is therefore "no likelihood of confusion between the parties' respective marks."  *Id.*

Turning to irreparable harm, HP argues the statutory presumption of irreparable harm "is rebutted where, as here, Plaintiff delays in applying for preliminary injunctive relief because it undercuts the urgency and highlights that there is no irreparable harm."  *Id.* at 18.  HP disputes WEX's claim that it did not file

the instant suit until April 2024 "because it did not know how HP planned to use the mark until March 2024." *Id.* HP further characterizes WEX's evidence of irreparable harm as being "an unsupported, self-serving declaration of supposed and cherry-picked consumer comments on social media about HP." *Id.* According to HP, "Plaintiff's conclusory statements of irreparable harm to its goodwill and loss of control of its reputation are speculative and do not meet its high burden." *Id.* at 19 (citation omitted).

Finishing with the balance of hardships and public interest, HP represents it "would incur significant losses if a preliminary injunction issued, including the loss of time and money invested in the development, promotion, and launch of HP WEX, and irreparable damage to its goodwill and reputation from any abrupt halt and rebrand." *Id.* HP reiterates its view that WEX "has not experienced any customer confusion," and adds that "the hardship [WEX] asserts is false speculation about possible harm from being associated with a leading technology brand." *Id.* at 20. Finally, HP submits that the public interest would be harmed by a preliminary injunction in this case because there is no likelihood of confusion. *Id.*

### C.   WEX Inc.'s Reply

In its reply, WEX clarifies that the "mark at issue in this case is WEX, and both parties are using the exact same mark for their software." *Pl.'s Reply* at 2. WEX accuses HP of taking "an inappropriately narrow view of the record by comparing only the parties' stylized logos, though even those logos both plainly have WEX as their dominant element." *Id.* WEX further submits that "HP applied to register

'WEX' as a trademark standing alone, not as a logo or alongside the HP mark." *Id.*
In WEX's view, "[a]ll of HP's uses of 'WEX' are relevant, because likelihood of
confusion must be evaluated based on context." *Id.*

Turning to the strength of its mark, WEX clarifies that all its advertising
"supports the WEX brand" and that "WEX is not an acronym, and its incontestable
trademark registrations for WEX are immune to challenge as merely descriptive or
lacking distinctiveness." *Id.* at 2-3. Further, in WEX's view, "HP cannot claim WEX
is commonly used in the industry, while simultaneously trying to register 'WEX' as a
source-identifying trademark and claim exclusive rights to the term." *Id.* at 3.

Regarding the similarity of the goods, WEX observes that "the First Circuit
has explained that the question is not whether these services are identical, as HP
argues, but whether these are 'products which would be reasonably thought by the
buying public to come from the same source if sold under the same mark.'" *Id.*
(quoting *Purolator, Inc. v. EFRA Distribs.*, 687 F.2d 554, 562 (1st Cir. 1982)). WEX
submits that "[c]onsumers would expect a single company to offer both parties' WEX
products because multiple other companies already do," including Oracle, SAP, and
Rippling. *Id.* WEX further argues that "HP's attempt to distinguish its IT services
from the employee benefits services WEX offers is also inconsistent with HP's past
conduct in protecting its own 'HP' mark," in particular, HP's oppositions to trademark
"applications by companies seeking to offer benefits management software by arguing
a likelihood of confusion with HP's IT services." *Id.* at 4.

WEX next suggests that, even if the parties' customers are sophisticated, they will nevertheless be confused. *Id.* According to WEX, the "relevant consumers whose confusion matters in trademark cases" include "any [] 'persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.'" *Id.* (quoting *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10 (1st Cir. 2004)). WEX then asserts that in "attempting to narrow the Court's analysis to only the specific individuals who make purchasing decisions, HP relies on an outdated case that is not the current law of this Circuit." *Id.* at 5. WEX also maintains that, like HP, it "markets and sells its services directly to companies' IT teams." *Id.* In WEX's view, the Butler Survey also "shows why HP is incorrect to assert that nobody would be responsible for purchasing both WEX's services and HP's 'WEX'" as "Butler identified hundreds of individuals with those overlapping responsibilities." *Id.*

Responding to HP's criticisms of the Butler Survey, WEX maintains the "survey was conducted using reliable survey methodology, including the *Squirt* survey format that is routinely accepted, and accurately replicated the marketplace conditions [the] survey was designed to test." *Id.* at 6. WEX also points out that "HP submitted no survey of its own to disprove the confusion Butler showed, meaning their criticisms 'do not remedy the lack of affirmative evidence to the contrary.'" *Id.* (quoting *President & Trs. of Colby Coll. v. Colby Coll.-N.H.*, 508 F.2d 804, 809-10 (1st Cir. 1975)). WEX further submits that many of the issues identified by HP "would be

present in both the test and control groups, meaning any effect would be canceled out." *Id.*

With respect to HP's other actual confusion arguments, WEX submits that "HP's only response to evidence of media confusion was that the article on Investing.com was generated 'with the support of AI,' but HP ignores that it was also 'reviewed by an editor'—someone who was plainly confused." *Id.* at 6-7.

Ending its reply with a discussion of irreparable harm, WEX argues it "brought this case, and immediately moved for a preliminary injunction, barely a month after HP announced its WEX service and less than four months after HP filed its application for WEX." *Id.* at 7. WEX concludes by submitting that "HP has made clear that it has no intention of slowing its use of WEX unless enjoined, and Butler's survey demonstrates that will cause meaningful confusion in the market." *Id.* In WEX's view, "[a]bsent an injunction, HP will continue to foment confusion and deprive WEX of control over its trademark in the market." *Id.*

## IV.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). A judge should use the authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

To determine whether to issue a preliminary injunction, a court must analyze

four factors:

> (1) the likelihood of success on the merits; (2) the potential for
> irreparable harm [to the movant] if the injunction is denied; (3) the
> balance of relevant impositions, i.e., the hardship to the nonmovant if
> enjoined as contrasted with the hardship to the movant if no injunction
> issues; and (4) the effect (if any) of the court's ruling on the public
> interest.

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006)

(alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st

Cir. 2004)).

"The party seeking the preliminary injunction bears the burden of establishing

that these four factors weigh in its favor." *Id.* at 18. Ultimately, "trial courts have

wide discretion in making judgments regarding the appropriateness of such relief."

*Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## V.   DISCUSSION

### A.   Likelihood of Success on the Merits

#### 1.   Overview

"The sine qua non of this four-part inquiry is likelihood of success on the

merits: if the moving party cannot demonstrate that he is likely to succeed in his

quest, the remaining factors become matters of idle curiosity." *New Comm Wireless*

*Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato*

*Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming

that this factor is "the most important part of the preliminary injunction assessment"

(quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2007)). "The importance

of [the likelihood-of-success] inquiry is magnified in trademark cases because the resolution of the other three factors will depend in large part on whether the movant is likely to succeed in establishing infringement." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006).

"To succeed on a claim of trademark infringement, a plaintiff must establish (1) that its mark is entitled to trademark protection, and (2) that the allegedly infringing use is likely to cause consumer confusion*." Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 12 (1st Cir. 2008). Because HP concedes for purposes of this motion that WEX's marks are entitled to trademark protection, *Defs.' Opp'n* at 5 n.3, the Court only assesses likelihood of confusion.

### 2.    Likelihood of Confusion

As a preliminary matter, one of WEX's main theories is reverse confusion.[10] In contrast to forward confusion, where it is alleged that "customers will purchase goods from the infringing junior user . . . under the mistaken belief that they are purchasing from the senior user," *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 71-72 (1st Cir. 2008), "under a reverse confusion theory, customers purchase the senior user's goods under the 'misimpression that the junior user is the source of the senior user's goods.'" *Id.* at 72 (quoting 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:10 (4th ed. 2006)). In a case of reverse confusion, damage can

---

[10]    At oral argument, counsel for WEX clarified that WEX is alleging both forward and reverse confusion. Given that certain evidence, most notably the Butler Survey, is primary relevant for reverse confusion, the Court focuses on the reverse confusion theory for purposes of this order. The Court has not analyzed whether WEX has demonstrated a likelihood of success on the merits under a forward confusion theory.

result because the junior user's "use of the mark 'saturates the market and overwhelms the senior user,' such that 'the senior user loses the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (quoting 3 MCCARTHY, *supra*, § 23:10).  Regardless of whether a plaintiff alleges forward or reverse confusion, the likelihood of confusion analysis is the same.  *Id.*

The First Circuit has "interpreted 'likely confusion' to mean 'more than the theoretical possibility of confusion.'" *Bos. Duck Tours*, 531 F.3d at 12 (quoting *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996)).  "In other words, the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" *Id.* (quoting *Int'l Ass'n of Machinists*, 103 F.3d at 201).  Further, the confusion must "exist in the mind of a relevant person." *Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 10 (1st Cir. 2004) (quoting *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983)).  "Relevant persons are not only the actual or potential buyers of a plaintiff's product, but are also 'persons in a position to influence the purchasing decision[] or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.'" *Cue, Inc. v. Gen. Motors LLC*, No. 1:13-cv-12647-IT, 2016 U.S. Dist. LEXIS 99624, at *12 (D. Mass. July 29, 2016) (quoting *Beacon Mut.*, 376 F.3d at 10).

42

To assess likelihood of confusion, courts in the First Circuit consider the so-called *Pignons*[11] factors.  These factors are:

> (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*Borinquen Biscuit*, 443 F.3d at 120 (quoting *Astra Pharm.*, 718 F.2d at 1205).  "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight."  *Id.*  In addition, "because the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark."  *Int'l Ass'n of Machinists*, 103 F.3d at 201.  The Court examines the *Pignons* factors in turn.

### a.       Similarity of the Marks

Courts evaluate the first *Pignons* factor—the similarity of the marks—by taking into account the "sight, sound, and meaning" of the two marks.  *Bos. Duck Tours*, 531 F.3d at 24.  "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir. 1987) (alteration in original) (quoting *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981)).  Further, "context governs the similarity analysis. '[I]n determining the similarity of marks in an infringement action, a court

---

[11]      These factors were first synthesized in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

must examine the visual appearance of each mark in the context of its use.'" *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental*, 832 F.3d 15, 34 (1st Cir. 2016) (alteration in original) (quoting *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir. 1991)).

Here, HP is attempting to register "WEX" in "standard characters without claim to any particular font style, size, or color" in classes in which WEX has already registered the word, "WEX." *WEX Trademark Registration Certificates*; *Defs.' Opp'n*, Attach. 2, *TSDR Status for HP's "WEX" Trademark Application*. HP is therefore attempting to register a mark that looks and sounds the same as one of WEX's marks; indeed, both companies claim the word "WEX."

HP points out that, despite the marks' identical appearances, they have distinct meanings. WEX's mark began as an acronym for "Wright Express," *Dearborn Decl.* ¶ 7, while HP's mark is an acronym for "Workforce Experience Platform." *Salzman Decl.* ¶ 12. Yet these different meanings are not apparent from the marks themselves. WEX officially changed its name from "Wright Express" to "WEX" in 2012, *Dearborn Decl.* ¶ 8, and there is no evidence in the record that an appreciable number of consumers know WEX as "Wright Express" or even recognize that WEX began as an acronym. *Dearborn Rebuttal Decl.* ¶ 7. Although HP occasionally defines WEX as "Workforce Experience Platform," *HP WEX Press Release*, the HP WEX website usually refers to the platform as "WEX." *HP WEX Website*. Accordingly, while the two marks have different meanings, the Court finds based on this record

44

that those meanings are so highly attenuated that an ordinary consumer would not recognize them.

HP also attempts to distinguish the two marks by pointing to differences between the HP WEX logo and WEX's logo. "When evaluating marks containing words, the type of letters used (script or block), the color and composition of the background upon which they appear, and the spelling of the words, are important considerations." *Polar Corp. v. PepsiCo, Inc.*, 789 F. Supp. 2d 219, 228 (D. Mass. 2011).

Here, HP is attempting to register "WEX," standing alone:

> WEX

*HP Trademark Application for "WEX".* In addition to using the word "WEX," both parties advertise their products using logos. These logos primarily consist of the word "WEX" written in block letters and spelled the same way:[12]



*Dearborn Decl.* ¶ 24; *Defs.' Opp'n* at 6. To be sure, the logos are not identical. WEX's logo uses red, lower-case letters, and features an arrow on the left side of the "X."

---

[12]    The Court reproduces the parties' logos side-by-side, mindful of the First Circuit's admonition that courts "must examine the visual appearance of each mark in the context of its use," *Oriental Fin. Grp.*, 832 F.3d at 34 (quoting *Jim Beam*, 937 F.2d at 735).

*Dearborn Decl.* ¶ 24.  HP WEX's logo uses black, upper-case letters and features a stylized "W."  *HP WEX Website.*  Further, the HP WEX logo appears to the right of HP's house mark.  *Id.*  Despite HP's arguments to the contrary, *Defs.' Opp'n* at 6-8, these differences do not render the marks dissimilar.

Regarding HP's house mark being juxtaposed with the HP WEX logo, courts in this circuit have repeatedly concluded that the use of a house mark *aggravates* the likelihood of confusion under a reverse confusion theory, especially where, as here, the house mark belongs to a well-known brand.  *See Attrezzi*, 436 F.3d at 39 ("[S]ince the alleged harm is *reverse* confusion, to the extent [the house mark] is itself the more recognized label the linkage could actually aggravate the threat to Attrezzi LLC" (emphasis in original)); *Cue*, 2016 U.S. Dist. LEXIS 99624, at *15 ("In a case of reverse confusion, however, a junior user's consistent use of a housemark 'will *aggravate*, rather than mitigate[,] reverse confusion' by reinforcing the association of the similar mark with the alleged infringer" (emphasis in original) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230 (3d Cir. 2000)); *Trak Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1082 (D. Mass. 1979) (noting "the presence of 'Benner' on the ski might suggest to the consumer that Benner somehow is licensed to do business by Trak").  HP relies on *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir. 1981)—another case involving reverse confusion—to argue that the "use of a house mark dispels any appreciable confusion."  *Defs.' Opp'n* at 6.  However, *Pignons* is distinguishable.

In *Pignons*, the Swiss manufacturer of "Alpa" cameras sued the American camera manufacturer Polaroid for trademark infringement over several versions of the Polaroid SX-70 Land Camera, all of which bore the name "Alpha." 657 F.2d at 484-85. In assessing the marks' similarity, the First Circuit initially observed that "[m]arks less closely related in appearance and sound have been held to be confusingly similar." *Id.* at 487. Nevertheless, the *Pignons* Court determined that "the total effect of Polaroid's designation of its SX-70 Alpha cameras minimizes, if it does not eliminate, the possibility that Polaroid's mark might be confused" with Pignons' mark. *Id.* Specifically, the First Circuit noted that the word "Alpha" always appeared "in close proximity with an equally prominent and uniquely identifying designation, such as 'Polaroid SX-70 Land Camera Alpha 1.'" *Id.* The Court further noted that "the packaging of Polaroid and Pignons cameras differs substantially." *Id.* Ultimately, the *Pignons* Court concluded that "in certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer." *Id.*

In contrast to *Pignons*, here, the HP WEX logo only appears in conjunction with HP's house mark, not a longer product name. The present case is therefore more like those where courts have found that the use of a house mark alone aggravates the likelihood of reverse confusion. *See Attrezzi*, 436 F.3d at 39 (comparing "Attrezzi" to "Jenn–Air Attrezzi"); *Cue*, 2016 U.S. Dist. LEXIS 99624, at *2-3, *15 (comparing "CADILLAC CUE" to "CUE ACOUSTICS"). Further, nothing here is analogous to the packaging that helped distinguish the products in *Pignons*. Accordingly, the

Court concludes that HP's use of its house mark next to the HP WEX logo aggravates the possibility of reverse confusion by suggesting that WEX is owned by, or otherwise associated with, HP.

Especially in light of this aggravated potential for confusion, none of the other differences between the WEX logo and the HP WEX logo renders the logos dissimilar. While the differences in color and font are noticeable, the dominant element of both logos is the word "WEX" written in block letters in a straight line.  In the Court's view, based on the record before it, consumers are more likely to notice that both logos consist of the word "WEX" before they notice the subtle differences.  "Although the differences between the two logos are pronounced enough for a reasonable consumer to distinguish between the two logos, the designs are similar enough that a substantial number of consumers would reasonably believe that [WEX is] somehow . . . associated with the [HP] brand." *Polar Corp.*, 789 F. Supp. 2d at 231.  Accordingly, the Court concludes that the similarity of the marks factor favors WEX.

### b.    Similarity of the Goods

To preface its discussion of the second *Pignons* factor—the similarity of the parties' goods—the Court briefly recounts the salient features of the products at issue. WEX sells a proprietary set of software solutions and technologies, which it categorizes into three segments—Benefits, Mobility, and Corporate Payments—all sold under the WEX brand.  *Dearborn Decl.* ¶¶ 10, 13.  WEX's Benefits segment features software designed to simplify employee benefit management, including by allowing employees to enroll in and manage benefits throughout the plan year.  *Id.*

48

¶ 14.  Through its Mobility segment, WEX sells software aimed at simplifying the management of commercial vehicle fleets, including an online platform featuring alternative payment and money transfer options, comprehensive settlement solutions, real-time reports, analytics, cost-optimization, fuel reconciliation, and mobile optimization tools.  *Id.* ¶¶ 16-17.  Finally, in the Corporate Payments segment, WEX offers highly scalable and vertically integrated payments solutions that customers can integrate into their own technology and products.  *Id.* ¶ 19.

HP WEX is a workforce experience and cybersecurity product marketed to HP's enterprise clients, which streamlines technology updates, strengthens the cybersecurity of connected devices, and provides CIOs with data analytics and employee sentiment regarding connected devices.  *Salzman Decl.* ¶ 5.  HP WEX uses AI to gather customer-specific data about employee usage of connected devices to help CIOs monitor and determine when to fix or upgrade the technology they manage.  *Id.* ¶ 7.  In the future, HP plans to add features to HP WEX to help CIOs determine when a cybersecurity anomaly exists on a device and the root cause of the anomaly, and help employees troubleshoot their own device support issues; however, HP has no plans to add any payment support or financial services features to HP WEX.  *Id.*

As the preceding discussion makes clear, WEX's products share some similarities with HP WEX, but the parties' offerings are not identical.  Both parties offer software to business customers designed to simplify internal business and management logistics.  Yet the parties' respective software products serve distinct purposes; WEX assists businesses with employee benefit management, vehicle fleet

management, and corporate payments, while HP WEX assists businesses with device fleet management.

If the similarity of the goods factor required products to be identical, this distinction would end the inquiry. However, "[p]roducts sold under similar marks need not be identical to engender confusion." *Anheuser-Busch*, *Inc. v. Caught-On-Bleu, Inc.*, 288 F. Supp. 2d 105, 118 (D.N.H. 2003). "Trademark protection may extend beyond the exact product to include related products or services," *Polar Corp.*, 789 F. Supp. 2d at 232, and "[a]n owner of a trademark is afforded 'protection against use of its mark on any product or service which would reasonably be thought by the buying public to have come from the same source.'" *Id.* at 233 (quoting *Anheuser-Busch*, 288 F. Supp. 2d at 118).

In WEX's view, since "the parties are both offering business-focused software solutions under the exact same mark," the products are similar enough that the similarity-of-goods factor weighs in its favor. *Pl.'s Mot.* at 12. WEX maintains that its products and HP WEX both are intended to "help manage the hurdles of running a business." *Id.* More precisely, WEX observes that both parties offer software for "fleet management," and argues this shared positioning makes HP WEX "even more likely to cause confusion." *Id.*

HP portrays WEX's characterizations as too high level and rejoins that the products "are only similar insofar as they relate to software, generally." *Defs.' Opp'n* at 8. According to HP, "[w]hat each software product does and why it is useful to its respective consumers differ so much as to render the better analogy to be one of jet

planes to roller blades, which are similar insofar as they both provide transportation." *Id.* (emphasis omitted).

After reviewing the record, the Court agrees with WEX that, although the parties' software offerings are not identical, they are nevertheless so similar that they "would reasonably be thought by the buying public to have come from the same source." *Polar Corp.*, 789 F. Supp. 2d at 233 (quoting *Anheuser-Busch*, 288 F. Supp. 2d at 118). WEX's software products and HP WEX are both targeted to business customers, with a value proposition of helping enterprises streamline and manage employee experiences. They also have similar functionalities; for example, both can measure employee engagement, with WEX tracking this metric with respect to benefits usage and HP with respect to electronic devices. *See Dearborn Decl.* ¶ 15; *Salzman Decl.* ¶ 5. Similarly, WEX's software provides analytics for fleets for vehicles, while HP WEX provides analytics for fleets of devices. *See Dearborn Decl.* ¶¶ 16-17; *Salzman Decl.* ¶ 5.

That WEX's products are broadly aimed at different aspects of the employee experience than those targeted by HP WEX does not render the products dissimilar. At least one other court considering the similarity-of-goods factor at the preliminary injunction stage concluded that this factor favors injunctive relief where, as here, two software programs share similar functionalities. *See Palantir Techs. Inc. v. Palantir.net, Inc.*, No. C 07-03863 CRB, 2008 U.S. Dist. LEXIS 6448, at *14-15 (N.D. Cal. Jan. 15, 2008) (noting "both companies offer products and services relating to the computer software industry generally, and their lines of business include database

analysis and management specifically," and "[b]oth companies offer clients the ability to manage and analyze data through software").

HP supplies no cases wherein a court has concluded that two software products are so dissimilar that the similarity-of-goods factor weighs against injunctive relief. In contrast to the products at issue here, the products in the two cases cited by HP shared minimal, if any, overlapping features. *See Pignons*, 657 F.2d at 487-88 (comparing two single lens reflex cameras with "little in common," and concluding that their "appearances are strikingly different so much so that one could not be mistaken for the other" and "their functional characteristics are equally distinct"); *Alta Vista Corp., Ltd. v. Digit. Equip. Corp.*, 44 F. Supp. 2d 72, 74, 77 (D. Mass. 1998) (comparing a literary services agency to a search engine, and concluding that the plaintiff "offers literary services, and [the defendant] does not").

The similarity of the goods here is reinforced by the how the parties market their respective software products. The home page of WEX's website lists "[f]uel cards and fleet management" as one of WEX's products. *WEX Webpages* at 2-3. HP WEX's website similarly lists "[f]leet management" as one of the software's "[c]apabilities." *HP WEX Website* at 10. Therefore, promotional materials for both products indicate that each can be used for the same function, fleet management.

At oral argument, the parties conceded that they use "fleet management" differently. As HP points out, the technology industry uses "fleet" to refer computers, imaging and printing products, and related hardware. *Salzman Decl.* ¶ 8. Materials published by Dell, Lenovo, and Ricoh, all competitors of HP, use "fleet" in this

manner.  *Defs.' Opp'n*, Attach. 27, Shawn Jagodzinski*, Managing Device Fleets in the Hybrid Work Era*, DELL TECHS.: DELL BLOG (Apr. 26, 2022) (*Dell Article*); *id.*, Attach. 28, *Lenovo Device Manager Webpage*; *id.*, Attach. 29, Brian Wallace, *Managing Your Device Fleets: Four Questions You Should Consider*, RICOH (*Ricoh Article*).

Even though the parties use "fleet management" differently, however, the fact that they both use this term at all is facially confusing.  There is no evidence in the record that the understanding of "fleet" espoused by HP extends beyond the technology industry, meaning some relevant consumers may not realize, upon seeing "fleet management" standing alone, that HP is referring to technology devices.  By using "fleet management" in conjunction with a product that shares its name with an independent company that offers fleet management solutions, HP is putting the onus on consumers to educate themselves about how HP's fleet management solutions are different from those offered by WEX.  Because the record contains no evidence that consumers will perform such self-education to dispel any initial confusion, the Court concludes that although the parties use "fleet management" differently, this shared marketing language is likely to exacerbate consumer confusion.

Further exacerbating the likelihood of confusion is the fact that some companies offer software products targeting the same niches as WEX's products and HP WEX.  For example, Rippling's "HR Cloud" offers software for employee benefits, while its "IT Cloud" offers software for device management.  *Dearborn Rebuttal Decl.* ¶ 32; *Pl.'s Reply*, Attach. 6, *Rippling Website*.  Oracle and SAP both offer similar software products as well.  *Dearborn Rebuttal Decl.* ¶¶ 33-34; *Pl.'s Reply*, Attach. 7,

*Oracle Website*; *id.*, Attach. 8, *SAP Website*. As multiple companies already offer overlapping services, consumers may well believe that WEX's products are somehow affiliated with HP, precisely the harm a reverse confusion trademark infringement claim is intended to prevent.[13]

Accordingly, the similarity-of-goods factor favors WEX because 1) WEX's products and HP WEX feature similar functionalities and are both aimed at simplifying internal business management logistics, 2) both companies advertise their products for "fleet management," and 3) other companies offer overlapping products.

### c.    Channels of Trade, Advertising, and Prospective Purchasers

"Factors three (channels of trade), four (advertising), and five (classes of prospective purchasers) are often considered together because they tend to be interrelated." *Beacon Mut.*, 376 F.3d at 19. "Channels of trade refer to the distribution methods and markets in which the products are sold." *Plixer Int'l*, 2020 U.S. Dist. LEXIS 78047, at *11 (quoting *Butcher Co., Inc. v. Bouthot*, 124 F. Supp. 2d 750, 756-57 (D. Me. 2001)).

Regarding channels of trade, the record suggests that the parties' software products reach consumers in different ways. HP anticipates primarily selling HP

---

[13]    HP argues it is nevertheless unlikely that consumers will associate HP WEX with WEX's products because HP is a computer company while WEX is a "commercial banking company." *Defs.' Opp'n* at 8-9. However, "[t]he relatedness of each company's prime directive is not relevant." *Palantir Techs.*, 2008 U.S. Dist. LEXIS 6448, at *14 (quoting *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999)). The fact that both parties offer products that are clearly not likely to be confused, such as computers and fuel cards, has no bearing on whether they nevertheless offer products that are likely to be confused.

WEX already installed on HP computers and other hardware purchased from HP. *Salzman Decl.* ¶ 11. Since WEX does not sell hardware, it cannot distribute its software in this manner. However, even though there is a distinction in the parties' channels of trade, this is of limited value because purchasers can acquire HP WEX independently of HP hardware, meaning there is some overlap in channels of trade. *See id.* (noting that "[m]any, if not most," sales of HP WEX will include hardware).

Turning to advertising, both parties maintain websites and social media accounts. *See Dearborn Decl.* ¶¶ 26, 38; *Salzman Decl.* ¶ 14; *WEX Webpages*; *HP WEX Website*. In addition, they advertise at trade shows and industry conferences, and attempt to cultivate client relationships directly and, at least in in WEX's case, through third-party partners. *Dearborn Decl.* ¶¶ 28, 30; *Salzman Decl.* ¶¶ 11, 14, 16; *Dearborn Rebuttal Decl.* ¶ 38. However, the Court likewise finds these similarities of little probative value.

The fact that both companies have an online presence is not likely to cause confusion, as most companies with the reach of WEX and HP operate websites and social media accounts. *See Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-cv-02770-WHO, 2014 U.S. Dist. LEXIS 149575, at *35-36 (N.D. Cal. Oct. 20, 2014) ("[T]he use[] of the internet as a marketing channel is ubiquitous and, thus, does not shed much light on the likelihood of consumer confusion"). Further, WEX only identifies one conference attended by both parties—the Salesforce Dreamforce Conference—and it is not clear from the record whether HP has attended the conference since announcing HP WEX, as the most recent evidence of HP's

attendance is from 2019. *Dearborn Rebuttal Decl.* ¶ 38 & n.17. It is also unclear whether HP's Workforce Solutions business unit has attended this conference.[14] *Salzman Decl.* ¶ 16. Absent specific evidence of the parties advertising at the same trade shows, the fact that both advertise at trade shows generally is unlikely to create confusion. *See Cutting Edge*, 2014 U.S. Dist. LEXIS 149575, at *36-37 (finding no likelihood of confusion in part because "the companies' products are not shown at [the] same trade shows or in the same trade publications").

In terms of prospective customers, both parties cater to companies in a variety of industries. *Compare Dearborn Decl.* ¶ 29 (noting that WEX's customers operate in fields including "finance, banking, fintech, travel, technology, insurance, government, charge point operations, construction, fuel, benefit administration, and trucking and logistics"), with *id.* ¶ 45 (noting that HP WEX "collaborators" include Volkswagen, Commerzbank, Saipem, Atomic Cartoons, and Bekaert), *and HP WEX Website* at 2, 16 (displaying HP WEX's collaborators). However, WEX's customer base appears to be broader, as WEX caters to companies of all sizes as well as government agencies, whereas HP typically does business with large enterprises only. *Dearborn Decl.* ¶ 29; *Salzman Decl.* ¶ 11.

Even though WEX and HP target similar—and in a few cases the same[15]—companies, they vigorously dispute whether they target the same individuals and

---

[14]   With respect to conference attendance, HP represents that its Workforce Solutions business unit focuses on the Gartner Data & Analytics Summit, the Cyber Security Summit, and the NVIDIA GTC, and that it is not aware of WEX attending any of these events. *Salzman Decl.* ¶ 16.

[15]   Bekaert is an existing WEX customer and an HP WEX collaborator. *Dearborn Decl.* ¶ 45. In addition, Verizon, American Express, Booking.com, and 7-Eleven are all WEX customers that are either HP customers or otherwise affiliated with HP's products or services. *Dearborn Rebuttal Decl.*

functions within those companies.  HP represents that "HP WEX is marketed to Chief Information Officers ("CIOs") and other executive-level information technology managers." *Salzman Decl.* ¶ 5.  WEX targets a wider variety of individuals, including Chief Executive Officers, Chief Financial Officers, Chief Human Resources Officers, Chief Technology Officers, general managers, human resources personnel, procurement professionals, and information technology executives.  *Dearborn Decl.* ¶ 20.  HP argues that WEX "has no evidence of overlapping purchasers," *Defs.' Opp'n* at 11, while WEX takes issue with HP's narrow definition of its customer base. *Dearborn Rebuttal Decl.* ¶ 27.

At the very least, the record reveals that both parties target technology executives.  Although HP argues HP WEX is only marketed to CIOs, this assertion is undercut by the HP WEX website, which broadly states the product is "[f]or IT leaders" and "[f]or IT managers and admins." *HP WEX Website* at 11.  IT leaders, managers, and administrators are among the professionals targeted by WEX. *Dearborn Decl.* ¶ 20; *Dearborn Rebuttal Decl.* ¶ 27.

The record also contains evidence that CIO is not always a standalone role and can overlap with other roles, including Chief Technology Officer, another WEX target customer.  *Dearborn Rebuttal Decl.* ¶ 28.  In addition, all individual respondents to the Butler Survey were potential WEX customers who were also responsible for selecting their company's internet-connected devices, further reinforcing the potential overlap in customers between WEX and HP WEX.  *Butler Decl.* ¶ 2.

---

¶¶ 25-26.  It is possible these companies could become HP WEX customers, as HP anticipates that at least 80% of HP WEX purchasers will be existing HP customers.  *Salzman Decl.* ¶ 11.

Accordingly, there appears to be at least some overlap between prospective purchasers of WEX's software and HP WEX.

However, even when there is an overlap in customers, "there is less likelihood of confusion between products when they are expensive and purchased by sophisticated consumers or after careful consideration." *Plixer Int'l, Inc. v. Scrutinizer GMBH*, No 2:16-CV-578-DBH, 2020 U.S. Dist. LEXIS 78047, at *14 (D. Me. May 4, 2020) (citing *Pignons*, 657 F.2d at 489; and *Astra Pharm.*, 718 F.2d at 1206). HP represents that HP WEX will cost at least six figures to acquire, and that the sales process will take at least six months.[16] *Salzman Decl.* ¶ 11. WEX has not provided concrete pricing information for its software, only representing that it charges fees on a monthly and per participant or transaction basis. *Dearborn Rebuttal Decl.* ¶ 39. Though this fee structure may render WEX software less costly for small companies, the fees likely add up for larger ones, which have more employees and transactions. Therefore, for the parties' overlapping customers, WEX's products are also likely quite costly.[17]

While the prospective-purchasers factor in particular would benefit from further factual development, especially with regard to WEX's sales process, the evidence in the record suggests the parties' customers "exercise a relatively high degree of care," meaning "they are more likely to recognize the difference" between

---

[16]   HP divides the sales process into the "discovery phase," wherein the customer will conduct due diligence on the software, and the "financial quoting phase," wherein HP and the customer will negotiate a sales price and ultimately enter into a sales contract. *Salzman Decl.* ¶ 11.

[17]   At oral argument, the parties briefly discussed their pricing models and sales processes but did not expand upon the information included in their written filings.

the parties' products. *Peoples Fed. Sav. Bank v. People's United Bank*, 750 F. Supp. 2d 217, 226 (D. Mass. 2010) (concluding the level of care and sophistication exercised by individuals choosing a bank weighed against a likelihood of confusion). Accordingly, although the parties have overlapping customers, this collection of factors favors HP because those customers are sophisticated, and HP anticipates some companies will acquire HP WEX by purchasing HP devices with the software already installed.

### d.   Actual Confusion

Before discussing actual confusion, the Court first reiterates that WEX's burden is "to show likelihood of confusion, not actual confusion." *Borinquen Biscuit*, 443 F.3d at 120. "While evidence of actual confusion is 'often deemed the best evidence of possible future confusion,' proof of actual confusion is not essential to finding likelihood of confusion." *Id.* (quoting *Attrezzi*, 436 F.3d at 40). The First Circuit has "attached substantial weight to a trademark holder's failure to prove actual confusion only in instances in which the relevant products have coexisted on the market for a long period of time." *Id.* at 121; *see also Pignons*, 657 F.2d at 490 (noting "[e]vidence of actual confusion is not invariably necessary to prove likelihood of confusion" but "absent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion" (internal quotation omitted)).

Since HP WEX is not yet available to the public,[18] WEX is under no obligation to proffer evidence of actual confusion.

Nevertheless, WEX points to two pieces of evidence it believes show actual confusion, namely, an Investing.com article associating WEX's stock ticker with HP WEX and the results of the Butler Survey. *Pl.'s Mot* at 15-16; *Pl.'s Reply* at 5-7. HP responds that neither piece of evidence is probative of actual confusion, *Defs.' Opp'n* at 13-15, and further submits that it is not aware of any person expressing confusion about whether HP WEX is related to WEX, or vice versa. *Salzman Decl.* ¶ 14.

The Court initially disregards HP's suggestion that because HP has not received any information about customers being confused, no customers have in fact been confused. *See Defs.' Opp'n* at 13. The promotion of HP WEX—which was just announced in March 2024—has been limited to the HP WEX website, social media, press releases, promotional videos, and industry events. *Salzman Decl.* ¶¶ 5, 14; *Dearborn Decl.* ¶ 38. HP has provided no evidence that this advertising has been so widespread as to saturate the market. To the contrary, a Google search submitted by WEX suggests that if a consumer searches for "WEX" or "WEX application," no results related to HP WEX even appear.[19] *Dearborn Rebuttal Decl.* ¶¶ 9, 10; *Pl.'s Reply*, Attach. 3, *Google Search Results for "WEX"*; *id.*, Attach. 4, *Google Search*

---

[18]    HP represented to the Court in May 2024 that a private beta launch of HP WEX would begin in June 2024, followed by a public beta launch in September 2024 and a full public launch in March 2025. *Salzman Decl.* ¶ 10.

[19]    In addition, when searching for "WEX application," Google suggests a related search of "What is a WEX application," for which the first suggested result is WEX's website. *Dearborn Rebuttal Decl.* ¶ 10; *Google Search Results for "WEX application"*. Both Google searches submitted by WEX were completed after browsing data, cookies, and search history were cleared. *Dearborn Rebuttal Decl.* ¶¶ 8-9.

*Results for "WEX application"*.  Against this backdrop, HP not receiving any reports of confusion carries little weight.

Turning to WEX's proffered evidence, the Court determines that the Investing.com article is probative of future confusion.  The article, published on March 7, 2024, states that "HP's WEX (NYSE:WEX) platform offers an AI-driven interface that simplifies the user experience by integrating multiple services into a cohesive dashboard."  *Investing.com Article*.  "NYSE:WEX" refers to WEX's stock ticker.  *Dearborn Decl.* ¶ 47.  Elsewhere, the article associates HP's stock ticker with a reference to HP Inc.[20]  *Investing.com Article*.

The bottom of the Investing.com article reads, "This article was generated with the support of AI and reviewed by an editor."  *Id.*  The article's byline identifies its editor as Brando Bricchi.  *Id.*  HP argues the involvement of AI in the article's creation undermines the article's probative value because "[o]ne of the known flaws of modern AI systems is their ability to 'hallucinate' facts."  *Defs.' Opp'n* at 13 n.7.  However, as WEX points out, this argument does not account for the article's representation that AI-generated text was "reviewed by an editor."  *Investing.com Article*; *Pl.'s Reply* at 6-7.  Accordingly, the article's text contradicts HP's suggestion that the reference to WEX's stock ticker was an AI glitch and "no person" was confused.  *Defs.' Opp'n* at 13-14 (emphasis omitted).

---

[20]   Specifically, the article states, "In a recent announcement at the Amplify Partner Conference, HP Inc. (NYSE:HPQ) unveiled a series of new services and solutions aimed at enhancing partner capabilities and driving sustainability."  *Investing.com Article*.

To be sure, a stray reference to WEX's stock ticker does not establish that Mr. Bricchi, the article's editor, was actually confused about the relationship between WEX and HP. The Court cannot ignore, however, that the reference to WEX's stock ticker appears immediately after the word "WEX." *Investing.com Article*. At the very least, therefore, the name of "HP WEX" made it easier for an editor to miss an erroneous reference to WEX's stock ticker.

Further, as WEX convincingly argues, errors in the press are relevant because "WEX's 'commercial interest in the [WEX] mark' will be threatened if journalists lead the public to believe that HP's product is associated with WEX's stock." *Pl.'s Mot.* at 15 (alteration in original) (quoting *Beacon Mut.*, 376 F.3d at 16). WEX claims, and HP does not dispute, that Investing.com is "ranked among the top three financial websites worldwide," *Dearborn Decl.* ¶ 47, meaning consumers turn to the website for information. In light of the site's popularity, the Court infers that consumers trust it to deliver accurate information and would believe from the erroneous reference to WEX's stock ticker that HP and WEX are somehow affiliated. Given the reach of Investing.com, and the possibility of similar errors appearing in future articles, the Investing.com article is somewhat probative of actual confusion.[21]

Also somewhat probative of actual confusion, in the Court's view, is the Butler Survey, the results of which suggest that 20.8% of respondents were confused solely by HP's use of "WEX." *Butler Decl.* ¶ 5. "Consumer survey evidence is often used to

---

[21]     For this reason, the Court also rejects HP's argument that the Investing.com article is merely "an isolated example of purported confusion." *Defs.' Opp'n* at 14. Because neither of the cases HP relies upon involved the publication of misleading information to third parties, the Court finds them distinguishable. *See Int'l Ass'n of Machinists*, 103 F.3d at 205-06; *Pignons*, 657 F.2d at 490-91.

demonstrate actual confusion in trademark infringement cases." *Anheuser-Busch*, 288 F. Supp. 2d at 120-21 (citing *Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 31-32, 31 n.9 (1st Cir. 1989); and *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 46 (D. Mass. 1995)). "A survey need not demonstrate that all consumers, or even a majority of them, would actually be confused," and courts have found that a rate of confusion as low as 10-12% is sufficient to demonstrate actual confusion. *Id.* at 121 (citing *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400-01 (8th Cir. 1987); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979); and *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 507 (5th Cir. 1980)).

Though consumer surveys can be helpful, "[t]he field of consumer survey research is 'not unqualified and without hazards.'" *Hilsinger Co. v. Kleen Concepts, LLC*, No. 14-14714-FDS, 2017 U.S. Dist. LEXIS 141659, at *31 (D. Mass. Sept. 1, 2017) (quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010)). "[A]ny survey is of necessity an imperfect mirror of actual customer behavior under real life conditions" and instead "is a sample, albeit a scientifically constructed one." *Id.* (quoting 6 MCCARTHY, *supra*, § 32:184). "The value of survey evidence turns on the design of the survey and the methodology used by the surveyor." *Rimowa Distrib., Inc. v. Travelers Club Luggage, Inc.*, 217 F. Supp. 3d 400, 409 (D. Mass. 2016) (citing *In re Hotels.com, L.P.*, 573 F.3d 1300, 1305 (Fed. Cir. 2009)).

While submitting no survey evidence of its own, HP launches five attacks against the Butler survey, contending the survey is unreliable for "showing HP's HP WEX website and Plaintiff's website in sequence, contrary to market conditions,

encouraging respondents to re-review and match the HP WEX website, asking leading questions, surveying an inappropriate and poorly defined sample, and failing to control for respondent confidence." *Defs.' Opp'n* at 15.

Specifically, HP first maintains the *Squirt* survey format "was the incorrect survey format to use" because WEX's products and HP WEX will not be "sold in the same stores or websites." *Defs.' Opp'n* at 14. Second, according to HP, the methodology employed in the Butler Survey "does not reflect the circumstances in which consumers encounter Plaintiff's and HP's marks in the marketplace" because "no HP customer will purchase HP WEX based solely on a website." *Id.* at 14-15. Third, HP argues the Butler Survey "skews the results with leading questions that encouraged respondents to hunt for associations." *Id.* at 15. Fourth, HP critiques the Butler Survey as being "predicated on the incorrect assumption that the same individuals would be potential customers of both parties and used vague screener questions." *Id.* Finally, HP suggests the Butler Survey "failed to control for respondent certainty in their 'confusion,' effectively counting respondents as 'confused' when they were guessing." *Id.*

The Court considered each of HP's criticisms of the Butler Survey. Though the Court finds them valid in some respects, the Court is not convinced at this preliminary stage that it should entirely disregard the results of the Butler Survey, especially in light of HP's failure to submit its own countervailing survey evidence. Ultimately, the Court is mindful that "there is 'no such thing as a perfect survey.'" *THOIP*, 690 F. Supp. 2d at 230 (quoting 6 MCCARTHY, *supra*, § 32:178). Instead, a

survey is merely "an experimental environment from which we can get useful data from which to make informed inferences about the likelihood that actual confusion will take place." *Id.* (quoting 6 MCCARTHY, *supra*, § 32:184). After reviewing HP's criticisms in detail, the Court does not agree that the Butler Survey was "fundamentally flawed" to the point of not "demonstrat[ing] any actual confusion." *Defs.' Opp'n* at 14. To the contrary, the Court finds that the Butler survey created an experimental environment that suggests a strong possibility of consumer confusion if HP WEX were fully launched and actively promoted.

Because the Investing.com article and the Butler Survey suggest consumers may associate WEX with HP based on the name of HP WEX, the Court concludes the actual confusion factor favors WEX. Even if the Investing.com article and Butler Survey, standing alone, do not conclusively demonstrate a likelihood of confusion; they provide relevant datapoints properly considered with the constellation of evidence presented in conjunction with the other *Pignons* factors.

### e.    HP's Intent in Adopting the "WEX" Marks

"Whether the defendant acted in bad faith in adopting its mark is another factor to be considered in determining the likelihood of consumer confusion." *Bos. Duck Tours*, 531 F.3d at 25-26. An alleged infringer acts in bad faith if they adopt a mark "in order to cause market confusion or with an intent to exploit [the senior user's] reputation and goodwill." *Dorpan, S.L. v. Hotel Meliá, Inc.*, 728 F.3d 55, 68 (1st Cir. 2013); *see also Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 395 (D. Mass. 2010) ("Bad faith requires proof that

one party intended to capitalize on the holder's reputation/goodwill and confusion between the marks").

The record contains no evidence that HP acted in bad faith. According to HP, WEX is an acronym for "Workforce Experience Platform," a name chosen to reflect the software's capabilities and align with the name of the Workforce Solutions business unit. *Salzman Decl.* ¶ 12. HP further maintains that it was not aware of WEX's existence when it named HP WEX. *Id.* ¶ 13. At oral argument, counsel for HP reinforced that HP chose the name "WEX" based on its own branding objectives. Since these assertions are uncontradicted, the current record does not suggest that HP adopted the WEX mark with the intent to capitalize on WEX's goodwill or sow confusion.

Since WEX does not have contradictory facts, it argues the Court can infer bad faith on the part of HP because "[f]ederal registration serves as constructive notice to the public of the registrant's ownership of the mark." *Pl.'s Mot.* at 16 (quoting *Dorpan*, 728 F.3d at 61). In WEX's view, "HP's 'use of a mark which is the same or confusingly similar to [WEX's] mark as stated in its federal registration certificate[s] cannot be justified by a claim of coincidence, good faith or lack of knowledge on the part of [HP].'" *Id.* (alterations in original) (quoting *Veryfine Prods., Inc. v. Colón Bros., Inc.*, 799 F. Supp. 240, 250 (D.P.R. 1992)).

This argument is foreclosed by First Circuit caselaw. "The First Circuit has drawn an important distinction between the 'willfulness' and the 'bad faith' of an alleged infringer." *Cue*, 2016 U.S. Dist. LEXIS 99624, at *23 (citing *Visible Sys.*, 551

F.3d at 75).  "While willfulness may be relevant to damages after a finding of infringement, only bad faith is relevant to a likelihood of confusion."  *Id.* (citing *Visible Sys.*, 551 F.3d at 75).  Further, "[m]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith."  *Unleashed Doggie Day Care*, 828 F. Supp. 2d at 395 (alteration in original) (quoting *NEC Elecs., Inc. v. New Eng. Cir. Sales, Inc.*, 722 F. Supp. 861, 866 (D. Mass. 1989)).

Even if HP had constructive knowledge or even actual knowledge of WEX's registrations, it would still not suggest a likelihood of confusion because knowledge of a competing trademark does not necessarily imply an intent to create confusion. Therefore, this factor favors HP.  *See Bos. Duck Tours*, 531 F.3d at 30 (noting the "absence of bad faith" by the alleged infringer "weighs against a finding of infringement").

### f.    Strength of WEX Inc.'s Marks

"[S]trong marks enjoy the greatest protection against infringement." *Anheuser-Busch*, 288 F. Supp. 2d at 124 (alteration in original) (quoting *Int'l Ass'n of Machinists*, 103 F.3d at 206).  In the First Circuit, "courts analyze the strength of a mark by focusing on its commercial strength instead of its theoretical classification." *Pub. Impact, LLC v. Bos. Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 292 (D. Mass. 2016).  The First Circuit has explained that:

> Various factors are relevant in ascertaining the strength of a trademark, including the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's efforts to promote and protect the mark.

*Borinquen Biscuit*, 443 F.3d at 121.

WEX has referred to itself as "WEX" in advertisements, on fuel cards, and on company documents since 1989, and the company officially changed its name from "Wright Express" to "WEX" in 2012. *Dearborn Decl.* ¶¶ 7-8. All WEX's products and services are now sold under the "WEX" brand. *Id.* ¶ 13. WEX has also made significant investments in promoting the "WEX" brand. In the past three years, the company has spent more than $100 million on advertising its products and services.[22] *Dearborn Decl.* ¶ 25; *Dearborn Rebuttal Decl.* ¶ 12. WEX also runs a variety of social media accounts and has received coverage from media outlets including CNBC and *The Guardian.*[23] *Dearborn Decl.* ¶ 26; *Dearborn Rebuttal Decl.* ¶ 12. In addition, WEX has received a number of media accolades, including being named one of the 100 fastest growing public companies by Fortune in 2019. *Dearborn Rebuttal Decl.* ¶¶ 13-14.

HP nevertheless argues that "WEX" is a weak mark because it is used by other companies. HP highlights Wolverine Execution Services, known as "WEX," "an independent broker-dealer specializing in the execution of equities, options, and

---

[22]    HP suggests the $100 million figure provided by WEX is unreliable because it "does not detail how much was spent marketing the WEX trademark as opposed to, for example, employee opportunities or salaries." *Defs.' Opp'n* at 17. The Court does not find this argument persuasive because WEX subsequently clarified that the $100 million figure "specifically *excludes* overhead costs, like employee salaries." *Dearborn Rebuttal Decl.* ¶ 12 (emphasis in original). Further, because all WEX's products and services are sold under the "WEX" brand, this is not a situation where proffered advertising expenditures "are not limited to promoting" the particular mark at issue. *Health New Eng., Inc. v. Trinity Health -- New Eng., Inc.*, No. 15-30206-MGM, 2016 U.S. Dist. LEXIS 124946, at *12 (D. Mass. Sept. 14, 2016).

[23]    HP argues that WEX's social media accounts add little, if anything, to the analysis as "Plaintiff has less than 2,000 followers on its 'X' social media account, and its posts receive minimal, if any, engagement." *Defs.' Opp'n* at 17; *id.*, Attach. 10, *Screenshot of WEX X Account*. The Court does not find this contention particularly helpful and instead notes that WEX has made 7,752 posts since starting its X account in March 2012. *Screenshot of WEX X Account*. Therefore, regardless of the number of followers WEX has, there can be no doubt the company has an active social media presence.

futures for institutional investors." *Defs.' Opp'n*, Attach. 11, *Wolverine's "Our Businesses" Webpage*. Wolverine Execution Services owns trademarks for "WEX CONNECT," in connection with "[d]irecting orders for securities trades by means of computer software which automatically directs trades to the best location for executing such orders," and "WEX WHEEL," in connection with "[f]inancial analysis, namely, compiling and analyzing statistics, data and other sources of information for purposes of equities, options and futures trading." *TSDR Status Page for "WEX CONNECT"*; *TSDR Status Page for "WEX WHEEL"*.

"Evidence of third-party use of similar marks on similar goods can be probative of a mark's relative weakness." *A. Simon & Sons, Inc. v. Simonfurniture Int'l, Inc.*, No. 21-cv-11254-PBS, 2021 U.S. Dist. LEXIS 248630, at *21 (D. Mass. Nov. 19, 2021). But the products offered by Wolverine Execution Services are distinguishable from those offered by WEX and HP. There is little overlap between stock trading software and software to help businesses manage internal logistics.[24] Further, WEX has a co-existence agreement with Wolverine Execution Services, demonstrating WEX's protection of its marks. *Dearborn Decl.* ¶ 49; *Dearborn Rebuttal Decl.* ¶ 46. The Court does not agree with HP that the existence of Wolverine Execution Services renders "WEX" a weak mark.

In sum, WEX has used "WEX" for roughly 35 years, it has spent large amounts of money advertising the "WEX" brand, and it has taken steps to protect the "WEX"

---

[24] For this reason, the Court finds the Imperial County Workforce Development Board's Adult Work Experience Program, known as "WEX," to be of no probative value. *See Defs.' Opp'n*, Attach. 16, *Adult Work Experience Program Website*. There is no overlap between a job-training program, like the Adult Work Experience Program, and WEX's products and services.

mark in the face of registration attempts by other entities. Accordingly, the Court concludes that the "WEX" mark is strong, and that this factor favors WEX.

### g. The Balance of the *Pignons* Factors

Having assessed the *Pignons* factors individually, the Court must now weigh them to determine whether WEX has shown that consumer confusion is likely to result from HP's use of "WEX." *See Borinquen Biscuit*, 443 F.3d at 120 ("A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight"). To recap, the Court concluded that the similarity of the marks, the similarity of the goods, actual confusion, and the strength of WEX's mark all favor WEX. In contrast, HP's intent and the products' channels of trade, advertising, and customers favor HP. After balancing the *Pignons* factors, however, the Court determines that confusion is likely.

The First Circuit has remarked that the "most critical" factors in the likelihood of confusion analysis are "evidence of actual confusion, similarity of marks, similarity of goods and services, and strength of marks." *Beacon Mut.*, 376 F.3d at 20. All four of these factors favor WEX, and viewing them together demonstrates why HP's use of "WEX" is likely to cause confusion. WEX's products and HP WEX have nearly identical names, and the only difference—the meaning of the marks—is not apparent to consumers. The products themselves are also similar, and their similarities are exacerbated by HP's repeated references to HP WEX as a "fleet management" solution and the fact that other companies offer the types of software products sold by both parties. WEX's mark is strong, as WEX has used the mark for three and a

half decades, invested in the mark, and taken steps to protect the mark in the past. Finally, through media and survey evidence, WEX has shown actual confusion, "often deemed the best evidence of possible future confusion." *Attrezzi*, 436 F.3d at 40.

The factors favoring HP do not counterbalance this evidence. In particular, the First Circuit has "noted that the lack of intent on the alleged infringer's part to create confusion is not particularly useful in the ultimate determination of likelihood of confusion and 'may not outweigh other factors that suggest a likelihood of confusion.'" *Dorpan*, 728 F.3d at 69-70 (quoting *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 44 (1st Cir. 1998)). Further, the Court does not view the channels of trade, advertising, and customer bases as decisively favoring HP. To the contrary, WEX put forth evidence that its customer base overlaps with the customer base for HP WEX. The sophistication of consumers was what tipped the scales toward HP, and although consumer sophistication favors HP, it is not the law that sophisticated consumers cannot be confused.

Taken together, the evidence favoring WEX is overwhelming, while the evidence favoring HP is slight. Accordingly, the Court concludes that WEX is likely to succeed on the merits in this case because it has demonstrated that consumers are likely to be confused by the launch and promotion of HP WEX.

### B.  Irreparable Harm, Balance of Hardships, and the Public Interest

#### 1.  Irreparable Harm

Having concluded that WEX is likely to succeed on the merits, the Court next considers the second prong of the preliminary injunction analysis. Irreparable harm

is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  For the Court to grant the motion for preliminary injunction, WEX must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").

Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's likelihood of success on the merits.'"  *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueriá Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)).  Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," however, "at least some positive showing of irreparable harm must still be made."  *Id.* at 43 (internal quotation omitted) (alteration in original); *see also Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

Pursuant to the Trademark Modernization Act (TMA) of 2020, a trademark plaintiff that demonstrates a likelihood of success is entitled to a rebuttable

presumption of irreparable harm.[25]   15 U.S.C. § 1116(a); *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 554 F. Supp. 3d 284, 307 (D. Mass. 2021).  The First Circuit has not addressed the mechanics of applying this rebuttable presumption; however, the Third Circuit has explained that once a plaintiff establishes a likelihood of success, "the burden of production shifts to the defendant to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 186 (3d Cir. 2022).  "If a defendant successfully rebuts the TMA's presumption by making this slight evidentiary showing, the presumption has no further effect," and "the burden of production returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction." *Id.*

Here, HP attempts to rebut the presumption of irreparable harm by arguing that because the instant motion was brought over four months after HP filed its trademark application, WEX improperly delayed in applying for a preliminary injunction. *Defs.' Opp'n* at 18.  Traditionally, courts have held that unreasonable delay in bringing a motion for preliminary injunction weighs against a finding of irreparable harm. *See Polar Corp.*, 789 F. Supp. 2d at 239 ("In circumstances where a plaintiff's delay is unreasonable, the court may fairly infer that the plaintiff concluded that there was no infringement but later brought an action because of the

---

[25]     15 U.S.C. § 1116(a) provides, in relevant part:

A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.

strength of commercial competition" (internal quotation omitted)); *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021) ("[T]he significant delay in bringing the preliminary injunction motion counsels against a finding of irreparable injury").  Even assuming, however, that the four-month gap identified by HP is sufficient to rebut the TMA's presumption of irreparable harm, the Court nevertheless concludes that WEX has carried its burden of showing irreparable harm.

At the outset, the Court notes that "[e]ffectuating the purpose of the Lanham Act 'requires a liberal interpretation of the irreparable injury factor.'"  *Polar Corp.*, 789 F. Supp. 2d at 238 (quoting *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 14 (1st Cir. 1986)).  In particular, the "loss of control" over a trademark and "the threatened devaluation of the strength of the mark" constitute irreparable harm.  *Id.* at 239; *see also Two Hands*, 563 F. Supp. 3d at 300 ("Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial because reputation is not calculable nor precisely compensable" (internal quotations omitted)).

The Court has already found that HP WEX, a software product similar to the software offered by WEX that shares the same name, is likely to cause reverse confusion.  HP has not yet launched HP WEX.  HP WEX is only in the private beta launch phase, which began in June 2024.  *Salzman Decl.* ¶ 10.  A public beta launch of HP WEX is scheduled to begin in September 2024, and HP is planning to launch

74

HP WEX to the general public in March 2025. *Id.* However, based on the Scheduling Order entered by the Magistrate Judge on June 17, 2024, the earliest that trial in this matter could take place is July 2, 2025, several months after the public launch of HP WEX. *Scheduling Order* at 2 (ECF No. 44). Further, HP has made no suggestion that it intends to alter or delay the launch of HP WEX because of this litigation. *See Pl.'s Reply* at 7.

By the time this case reaches trial, HP's use of "WEX" will have "saturate[d] the market and overwhelm[ed]" WEX, resulting in WEX "los[ing] the value of the trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *See Attrezzi*, 436 F.3d at 39 (internal quotations omitted). Should such a situation come to pass, WEX has offered evidence that an appreciable number of consumers will be confused about whether WEX is associated with HP WEX.[26] WEX understandably wants to prevent such confusion from occurring, as it has made significant investments in promoting and protecting "WEX" as a mark, and the company's reputation for trust and reliability is of enormous value. *Dearborn Decl.* ¶ 54; *Dearborn Rebuttal Decl.* ¶ 48. In the face of HP marching toward the launch of HP WEX unabated, WEX has shown the "threatened devaluation of the strength" of its mark, and it is likely to lose control

---

[26] HP misses the mark in suggesting that the only evidence of irreparable harm comes from the Dearborn Declaration. HP argues that WEX's "statements of irreparable harm to its goodwill and loss of control of its reputation" are "conclusory" and "speculative." *See Defs.' Opp'n* at 19. While some courts have concluded that "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm," *Two Hands*, 563 F. Supp. 3d at 301 (internal quotation omitted), the statements in the Dearborn Declaration, to the extent they even are speculative or conclusory, are not the only evidence of irreparable harm put forth by WEX. Other evidence of irreparable harm comes from the Butler Survey, for example, which suggests WEX will lose control over its brand should HP WEX be allowed to launch.

over the mark if HP is not preliminarily enjoined. *See Polar Corp.*, 789 F. Supp. 2d at 239. The Court concludes that WEX has shown irreparable harm.

This conclusion is not altered by HP's argument, outlined above, that WEX impermissibly delayed in bringing the instant motion. As a preliminary matter, the cases relied upon by HP are all distinguishable because they involved products that were already on the market, meaning the party seeking a preliminary injunction could easily discern the allegedly infringing nature of the challenged mark. *See Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 418 (S.D.N.Y. 1998); *Vital Pharms., Inc. v. PhD Mktg., Inc.*, No. 2:20-cv-06745-RSWL-JCx, 2020 U.S. Dist. LEXIS 208394, at *2-4 (C.D. Cal. Nov. 6, 2020); *Two Hands*, 563 F. Supp. 3d at 297-98. As the Court has previously noted, HP has not yet launched HP WEX to the general public.

Further, a party can avoid a finding of unreasonable delay by providing "a credible explanation for its inactivity." *Gidatex*, 13 F. Supp. 2d at 419. As HP noted in its opposition brief, WEX has represented that "[a]lthough HP applied for federal trademark registrations covering the WEX name in December 202[3], HP did not begin actually using the marks in commerce until its March 2024 announcement, which made clear - for the first time - what HP planned to do with the name and how confusingly similar to WEX's services HP's services would be." *WEX Inc.'s Mot. to Expedite Prelim. Inj. Br. Schedule and Opp'n to Defs.' Mot. for Extension* at 2 n.2 (ECF No. 13). In the Court's view, this is a "credible explanation" for the timing of the instant motion. Although HP claims the "application describes in detail the goods

76

and services it intends to use with the mark," the application nowhere states what HP WEX actually is. *See Pl.'s Mot.*, Attach. 5, *HP Trademark Application for "WEX"*. Instead, the application merely lists a series of fields in connection with which HP intends to use the "WEX" mark. *Id.* It was reasonable for WEX to wait for the official announcement of HP WEX in March 2024 to fully ascertain the nature of HP WEX before filing suit. *See Polar Corp.*, 789 F. Supp. 2d at 239 (finding no unreasonable delay because "defendants' trademark applications did not demonstrate actual distribution under the accused marks, but merely an intent to use"). Therefore, WEX has shown that it will be irreparably harmed absent preliminary injunctive relief.

### 2.      Balance of Hardships

In addition to the harm WEX would suffer absent a preliminary injunction, the Court must consider the harm HP would suffer upon the issuance of such relief. HP represents that it has invested nearly $14 million into HP WEX. *Salzman Decl.* ¶ 19. If faced with a preliminary injunction, HP would be required to spend between three and six months selecting a new brand for HP WEX, an effort that would cost upwards of $500,000. *Id.* In addition, HP would have to spend millions of dollars on marketing activities in order to rebrand HP WEX in the minds of potential customers, HP partners, market analysts, and journalists. *Id.* In addition to these monetary costs, HP also suggests it would suffer "irreparable damage to its goodwill and reputation from any abrupt halt and rebrand." *Id.* at 19.

The Court is not unsympathetic to HP's potential expenditures; however, it nonetheless concludes that the balance of hardships favors WEX for two reasons.

First, "[w]here adjudication on the merits is likely to reveal defendants' trademark infringement, harm to a defendant that flows from a preliminary injunction is typically entitled to less consideration than other harms for the purposes of the balancing analysis." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 282 (D. Mass. 2014). Here, the harm HP cites constitutes the expenses of rebranding a product that likely infringes on WEX's trademarks. Therefore, HP's complaints about the costs of a preliminary injunction carry less weight.

Moreover, in "balancing respective harms in this context, courts also consider the amount of time, money, and effort expended by the aggrieved party to promote its brand." *Id.* Even crediting HP's assertion that it spent $14 million developing HP WEX, this figure pales in comparison to the amount WEX has spent advertising and promoting the WEX brand, which it has used since 1989. Contrary to HP's contention, this is not a situation like *Pan Am World Airways, Inc. v. Flight 001, Inc.*, where the defendant risked going out of business if required to rebrand in the face of a preliminary injunction and the plaintiff did not put forth any evidence of harm in the absence of an injunction. No. 06 Civ. 14442 (CSH), 2007 U.S. Dist. LEXIS 51012, at *57-58 (D.N.H. July 13, 2007). HP has put forth no evidence that a rebrand of HP WEX would threaten its corporate livelihood, whereas WEX has put forth significant evidence of irreparable harm in the absence of preliminary injunctive relief. For these reasons, the Court concludes that the balance of equities favors WEX.

### 3.     The Public Interest

"[W]hen success on the merits of a trademark infringement claim is likely, motions to preliminarily enjoin the use of these trademarks will serve the public interest." *7-Eleven*, 60 F. Supp. 3d at 282.  This is because of "the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names." *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987); *see also Volkswagenwerk*, 814 F.2d at 820 ("[T]his court is mindful of the importance of and the need to protect trademarks from infringement.  The use of trademarks is designed to alert the consumer public as to the origin and source of the products.  It allows the public to depend on the constancy of the quality of products it seeks").

HP argues that a preliminary injunction would "harm the public interest by sowing confusion" as a result of an HP WEX rebrand and "delaying the distribution of a high quality, innovative product that customers have already expressed a desire to purchase." *Salzman Decl.* ¶ 20.  But this argument confuses the interest of the public as a whole with the interests of HP and its customers.  Ultimately, the Court agrees with WEX, and other courts, that the broader public interest is best served by the protection of trademarks from infringement and the accompanying "transparency, fair competition, and certainty in the source of goods and services." *Pl.'s Mot.* at 19-20.  Accordingly, this factor, like the other three preliminary injunction factors, favors WEX.

### C.    Bond

#### 1.    Legal Standard

Federal Rule of Civil Procedure 65(c) provides:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.   The United States, its officers, and its agencies are not required to give security.

"The purpose of such a bond is to ensure that the enjoined party may readily be compensated for the costs incurred as a result of the injunction should it later be determined that it was wrongfully enjoined." *Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982) (Stevens, J., concurring) ("Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.   The bond, in effect, is the moving party's warranty that the law will uphold the issuance of the injunction").

Although the First Circuit observed that "there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond," *Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991), district courts in this circuit, as a general rule, require bond to be posted in trademark infringement cases.   *See 7-Eleven*, 60 F. Supp. 3d at 286 (requiring a $150,000 bond); *Polar Corp.*, 789 F. Supp. 2d at 240 (requiring a $250,000 bond); *see*

*also* 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2954 (3d ed. 2013) (noting Rule 65(c) "is phrased in mandatory terms and the conclusion seems inescapable that once the court decides to grant equitable relief under Rule 65 it must require security from the applicant").

Even so, district courts are vested with "wide discretion" to set the amount of bond. *Axia NetMedia*, 889 F.3d at 11 (internal quotation omitted); *see also Totem Forest Prods. v. T & D Timber Prods.*, No. 2:17-cv-00070-JDL, 2017 U.S. Dist. LEXIS 26062, at *5 (D. Me. Feb. 24, 2017) ("The Court has discretion to determine the amount of the security").  In setting the amount of bond, courts typically take into account "the potential incidental and consequential costs as well as [] the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities."  WRIGHT, MILLER & KANE, *supra*, § 2954.  With respect to trademark cases in particular, relevant considerations include the cost of rebranding and lost sales.  *See Polar Corp.*, 789 F. Supp. 2d at 240.

In its opposition, HP asks that WEX be required to deposit a bond in the amount of $2,500,000 if the Court grants WEX's motion for preliminary injunction. *Defs.' Opp'n* at 20.  At oral argument, the Court sought to ascertain WEX's position on HP's bond request, which WEX outlined in a written memorandum submitted on July 1, 2024, following oral argument.  *Pl.'s Suppl. Notice* at 1-2.

In its supplemental filing, WEX avers that "HP's request for a bond in the amount of $2.5 million is not supported by the evidence (or any citation to authority in this Circuit suggesting such an amount is appropriate in this trademark

81

infringement action)." *Id.* at 1. In WEX's view, "HP's request overstates the potential harm" because "no changes to the underlying HP product or its functionality would be necessary to comply with WEX's proposed injunction." *Id.* In other words, WEX submits that "the only cost HP would be required to undertake following an injunction would be selecting a new name." *Id.* WEX further suggests that HP's "digital advertisements can be easily updated with a non-infringing name," hard-copy materials "can simply be stored while the case proceeds," and HP "does not have any product that would need to be sequestered or destroyed." *Id.* at 2. All told, WEX submits "that a bond in the amount of $50,000 (representing 20% of the total cost to HP of its original branding work) would be a more than generous estimate of the costs HP is likely to incur in selecting and implementing a new, non-infringing name for its software, and in making the necessary changes to HP's digital advertising materials." *Id.*

HP disagrees. *Defs.' Suppl. Notice* at 1-3. HP "respectfully requests that Plaintiff provide security of no less than $2,500,000 due to the costs and damages HP will incur if it is wrongly enjoined." *Id.* at 1. After citing caselaw in which courts have imposed substantial bond requirements, HP says it has invested $14,000,000 into the HP WEX product. *Id.* HP writes that should the Court issue a preliminary injunction, HP will not only lose its investment in the "WEX" mark, but also spend at least $500,000 to find and adopt a new brand. *Id.* at 1-2. After analyzing applicable and cited caselaw, HP urges the Court to conclude that it has a right to use the "WEX" mark. *Id.* at 2-3.

###    2.    Discussion

Applying First Circuit law, even if the Court has the discretion not to order a bond, it is appropriate to impose a bond requirement against WEX since it is apparent HP will incur damages as a result of the preliminary injunction.  The record contains only general assertions by HP as to the costs it will incur if it is required to rebrand its program.[27]  The Court discounts as hyperbole HP's contention that its "investment in HP WEX would be wasted" if a preliminary injunction were wrongfully issued. *Defs.' Suppl. Notice* at 1.  Although HP's investment in the name "WEX" would be wasted, its $14,000,000 investment in the underlying program, the heart and strength of the new product, will remain unaffected.  Nevertheless, it is inarguable that HP will be required to rebrand its new product in light of the Court's order, and the only estimate the Court has for the cost of rebranding is the $500,000 estimate provided by Dan Salzman, Global Head of HP Workforce Solutions Marketing. *Salzman Decl.* ¶ 19.

The Court concludes that the cost of rebranding is the fairest measure of the proper amount of bond.  Accordingly, WEX shall be required to post a bond in the amount of $500,000 within one week of the date of this order.

---

[27]    For example, HP claims it would need to "spend millions of dollars in affirmative marketing and other similar activities to re-brand HP WEX in the minds of potential customers, HP partners, market analysts, and journalists." *Salzman Decl.* ¶ 19.

## VI.   CONCLUSION

The Court GRANTS WEX Inc.'s Motion for Preliminary Injunction (ECF No. 9).  Defendants HP Inc. and Hewlett-Packard Development Company, L.P. are hereby preliminary restrained and enjoined as follows:

1. HP Inc. and Hewlett-Packard Development Company, L.P. shall not use or display "WEX" or any confusingly similar trademark or logo in connection with the promotion or sale of software products designed to simplify internal business and management logistics;

2. This order is binding upon HP Inc. and Hewlett-Packard Development Company, L.P., and their agents, servants, and employees, and upon all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise;

3. This order shall take effect upon the posting of the bond set forth below, and shall remain in effect until the conclusion of the trial of this matter; provided, however, that it may be dissolved or modified upon appropriate motion and a showing of good cause to this Court; and

4. WEX Inc. shall post a bond in the amount of $500,000 as soon as reasonably practicable after entry of this order, but in any event no later than one week from the date of this order.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 9th day of July, 2024